---

## Ex Parte Bird.

Solicitud para que se expida mandamiento de *Habeas Corpus.*

No. 29.—Resuelto en marzo 15, 1904.

Libertad de la Prensa.—La primera enmienda a la Constitución de los Estados Unidos garantiza la libertad de la prensa, pero no una licencia ilimitada para publicar lo que se quiera con respecto a las personas, funcionarios públicos.o jueces de tribunales, en su capacidad pública o privada.

Injurias a la Autoridad—Instituciones Americanas.—Las disposiciones contenidas en el artículo 265 del Código Penal español que preveen y castigan(*) el delito de injurias a la autoridad, no son incompatibles con el espíritu de las instituciones de carácter americano.

Id.—Delito de Carácter Infamante.—El delito de injurias a la autoridad, no es de carácter infamante, pues no se castiga con pena corporal, sino con pena correccional, y como ésta se cumple en la cárcel, tal delito es un *misdemeanor,* y solamente los delitos calificados de *felony* pueden tener tal carácter.

Gran Jurado—Tribunales Insulares.—Las disposiciones del artículo 5 de las enmiendas a la Constitución de los Estados Unidos no tienen aplicación a los tribunales insulares, en los que no es necesaria la acusación de un gran jurado para que en ellos pueda declararse culpable a un acusado.

Juicio por Jurado.—Si un acusado no solicitare a su debido tiempo el juicio por jurado, se entenderá que renuncia a él, y tal juicio sólo puede concederse en casos de *felony.*

Habeas Corpus—Nombramiento de Jueces—Juez de Facto.—Se presume que el nombramiento de un juez que esté actuando regularmente en un tribunal

ha sido hecho con las formalidades legales, pero en todo caso, la legalidad o ilegalidad de tal nombramiento no puede ser investigada en un procedimiento de *habeas corpus,* y aun en el caso de que no hubiera sido legalmente nombrado, tendría el carácter de juez *de facto,* y como tal sus resoluciones serían válidas y no podrían ser atacadas colateralmente por *habeas corpus.*

Código de Enjuiciamiento Criminal—Código Penal—Delitos Cometidos con Anterioridad a Julio 1, 1902.—Los nuevos Códigos Penal y de Enjuiciamiento Criminal, que empezaron a regir en julio 1, 1902, no tienen aplicación a actos o delitos cometidos con anterioridad a esa fecha.

Leyes in Pari Materia.—Las leyes *in pari materia* deben ser interpretadas conjuntamente, armonizándolas, si es posible, y en forma tal que no resulte incompatible con los principios generales de derecho.

Constitución de los Estados Unidos—Territorios.—Para que la Constitución de los Estados Unidos se entienda vigente en un territorio, es necesaria una Ley del Congreso que así lo disponga, o que sus beneficios se hagan extensivos a tal territorio por otros departamentos del Gobierno y que el Congreso tácitamente consienta en ello, lo que no ha tenido lugar con respecto a Puerto Rico.

Habeas Corpus—Jurisdicción Sobre la Persona del Acusado y Sobre el Delito.—En los casos en que apareciere que el tribunal tuvo jurisdicción sobre la persona del acusado y sobre el delito de que fué acusado, la solicitud de excarcelación por *habeas corpus* deberá desestimarse.

Id.—Objeto del Auto de Habeas Corpus.—El objeto del auto de *habeas corpus* es librar al peticionario de prisión ilegal, pero tal procedimiento no puede utilizarse a los efectos de una apelación o de un recurso por causa de error.

Los hechos están expresados en la opinión.

Abogados del peticionario: *Sres. Dexter* y *Hernández Usera.*

Abogado del Pueblo: *Sr. del Toro, Fiscal.*(*)

El Juez Asociado Sr. MacLeary, emitió la siguiente opinión del tribunal:

El día cuatro del corriente mes Hobart S. Bird presentó una solicitud al Hon. José S. Quiñones, Juez Presidente de la Suprema Corte, para un auto de *habeas corpus,* alegando que había sido arrestado en dicha fecha, por un oficial de la Corte de Distrito de San Juan, y detenido en custodia, de acuerdo con cierto mandamiento expedido por dicho tribunal de distrito, bajo una sentencia dictada por la Corte Suprema de Puerto Rico, en 27 del mes de febrero próximo pasado, en la causa de *El Pueblo de Puerto Rico* v. *Hobart S. Bird,* y acompañando a la citada solicitud, copia de dicha sentencia. El

Juez Presidente expidió el auto solicitado, y mandó que se viera la causa ante el tribunal en pleno, en 6 del presente mes, y de acuerdo con la súplica del demandado, se señaló el día 12 del mismo mes, para la vista, siendo el acusado puesto en libertad bajo fianza durante este intervalo. En la vista habida se discutió el caso para resolverlo hoy.

El peticionario alegó que estaba ilegalmente detenido y privado de su libertad por José Berríos, Alcaide de la prisión "La Cárcel," que corresponde a la cárcel del condado, en Puerta de Tierra, un barrio de San Juan, con violación de la Constitución de los Estados Unidos, y las leyes de los mismos, consignando los siguientes fundamentos:

"1. El Sr. Bird ha sido enjuiciado por infringir el artículo 265 del Código Penal, vigente en Puerto Rico al tiempo de la ocupación americana y que el Congreso de los Estados Unidos, en su Ley Orgánica de 12 de abril de 1900, sección 8, declaró vigente y con fuerza legal en Puerto Rico.

"Dicho artículo 265 al tiempo de la comisión de este delito por el Sr. Bird, era absolutamente nulo y sin fuerza legal, por ser incompatible con las instituciones americanas y, porque el mismo no era aplicable al caso que servía de base a este proceso.

"2. El artículo 265 ameritado, hacía la ofensa prescrita en él 'un crímen infame' (*infamous crime*) y lo castigaba con arresto mayor.(\*)

"Por esta razón, el denunciado no debía haber sido procesado sino previa la presentación de acusación por el gran jurado.

"3. Al denunciado Sr. Bird se le negó el derecho de ser juzgado por un Pequeño Jurado, como está garantizado por la Constitución de los Estados Unidos.

"4. Los procedimientos de la corte de distrito no fueron procedimientos legales, tales como los define y prescribe la Constitución de los Estados Unidos.

"5. En el acto del juicio oral, la corte de distrito estaba ilegalmente constituída, pues según los preceptos de la sección 33 de la Ley del Congreso de abril 12 de 1900, llamada la Ley Orgánica, los jueces de las cortes de distrito deben ser nombrados por el Gobernador, con la anuencia y consentimiento del Consejo Ejecutivo. Según consta en los autos, cuando el Sr. Bird fué juzgado y sentenciado en

la corte de distrito, uno de sus jueces, el Sr. Morera, se inhibió del conocimiento de la causa, y fué sustituído por el Sr. Don Angel Garcia Veve, nombrado por el Gobernador juez especial de la corte de distrito, pero no consta que su nombramiento haya sido aprobado por el Consejo Ejecutivo, ni que el puesto del Sr. Morera esté vacante por su muerte, renuncia, o por haber expirado el tiempo de su nombramiento. Por esta razón, todos los procedimientos de la corte de distrito, y con posterioridad, los del Tribunal Supremo, fueron ejecutados sin tener competencia para ello.

"6. Los procedimientos por los cuales el denunciado fué sentenciado en la corte de distrito, no fueron legales, porque en los autos consta que el Sr. Bird fué acusado de la comisión de este delito el 13 de febrero de 1902, y el segundo juicio, en el cual fué sentenciado, fué celebrado en octubre de 1903.

"El 1º. de julio de 1902, la nueva Ley de Enjuiciamiento Criminal empezó a regir, y según consta de los autos, los procedimientos no estaban regulados por esta ley, excepto lo que se refiere a la contestación del denunciado en el acto del *arraignment* de no ser culpable y señalamiento del día para la celebración del juicio oral. No consta en los autos que la acusación fuera presentada por el Fiscal en audiencia pública y a nombre de El Pueblo de Puerto Rico, ni que estuviera formulada bajo juramento de que estaba basada en la declaración de testigos juramentados ante él. Tampoco expresa claramente los hechos constitutivos del delito como lo exige la ley, y por lo tanto, la sentencia de la corte de distrito es completamente nula.

"7. El Sr. Bird tenía derecho a ser juzgado por jurado, según lo (\*) preceptúa el capítulo 10 del Código Penal, que empezó a regir en 1º. de julio de 1902.

"8. Al ser determinada esta causa por la Corte Suprema de Puerto Rico, ésta rehusó considerar los preceptos legales infringidos, que no hubieran sido presentados por el Sr. Bird, a pesar de que con anterioridad a esta sentencia del Tribunal Supremo, ya éste había sido transformado por Ley de la Asamblea Legislativa de Puerto Rico, de 12 de marzo de 1902, en tribunal de apelación con el deber de que en sus resoluciones, tanto en causas civiles como criminales, no se limitaría a considerar las infracciones de leyes o quebrantamientos de forma protestados por las partes, o expuestos en sus alegatos y que constaran en los autos, sino que además podría, para impartir mejor justicia, conocer de todos los hechos y procedimientos

en la causa, como constaran de los autos, y al mismo tiempo entrar en el fondo de la cuestión, para así administrar mejor justicia.

"9. La sentencia del Tribunal Supremo es nula por las razones ya expuestas.

"Por lo cual, el Tribunal Supremo, al dictar sentencia contra mi defendido, erró, causando así un perjuicio muy grande al denunciado y perjudicándolo en sus derechos."

El peticionario alega, además, que dicho arresto y detención fueron ilegales, a causa del mencionado procedimiento ilegal y nulo, y por no tener competencia la corte de distrito, ni el Tribunal Supremo, para conocer de la causa, por cuyas razones suplicó que se expidiera el auto de *habeas corpus* a su favor y que se excarcelara. Estos fundamentos se considerarán *seriatim*.

1. El primero, que alega que el artículo 265 del antiguo Código Penal, bajo el cual el demandado fué convicto, fué absolutamente nulo, por ser incompatible con las instituciones americanas y porque no era aplicable a los hechos, se considerará primeramente. Esta sección había sido la Ley de Puerto Rico por muchos años antes de la ocupación americana, y durante el gobierno militar, y cuando se estableció el gobierno civil por la Ley del Congreso, aprobada en 12 de (*) abril de 1900, continuó en vigor, por la sección 8 de la Ley citada, la que, pasando en silencio los *Disponiéndose,* que no son aplicables al presente caso, dice lo que sigue:

"Que las leyes y ordenanzas de Puerto Rico actualmente en vigor, continuarán vigentes, excepto en los casos en que sean alteradas, enmendadas o modificadas por la presente; o hayan sido alteradas o modificadas por órdenes militares y decretos vigentes cuando esta ley entre a regir, y en todo aquello en que la mismas no resulten incompatibles o en conflicto con las leyes estatutarias de los Estados Unidos no inaplicables localmente, o con las presentes disposiciones, hasta que sean alteradas, enmendadas o revocadas por la autoridad legislativa creada por la presente para Puerto Rico, o por una ley del Congreso de los Estados Unidos."

No se pretende que esta ley hubiere sido alterada, enmendada o modificada por órdenes o decretos vigentes en 1 de mayo de 1900, cuando empezó a regir la Ley Orgánica, ni se alega que este estatuto esté en conflicto o sea inconsistente con los estatutos de los Estados Unidos, no inaplicables localmente, o que esté en conflicto con las disposiciones de la Ley Orgánica, ni que ésta hubiese sido alterada, enmendada o revocada por la autoridad legislativa de Puerto Rico. Se alega simplemente que semejante ley es incompatible con las instituciones del Gobierno americano. Atendido el argumento oral del abogado defensor del solicitante, es de presumirse que él considera esta ley en conflicto con la primera enmienda de la Constitución de los Estados Unidos, que garantiza la libertad de la prensa. Pero tal no es el parecer de este tribunal. Dicho artículo de la Constitución dice lo que sigue:

"El Congreso no promulgará ninguna ley con respecto al establecimiento de una religión, o prohibiendo el libre ejercicio de la misma; o coartando la libertad de la palabra, o de la prensa; o el derecho del pueblo de reunirse pacíficamente y de dirigir peticiones al Gobierno, pidiendo la reforma de abusos."

Nosotros creemos, sin duda alguna, que nadie, bajo estas (\*) disposiciones de la Constitución, aun si se sostuviera que está vigente en esta Isla, podría reclamar que por las mismas tendría derecho de publicar, a su capricho, cuanto le plugiera en cuanto a personas o funcionarios, o jueces de los tribunales, es sus relaciones públicas o particulares. En otras palabras, es la libertad de la prensa y no la licencia desenfrenada lo que se intenta proteger por esta disposición de la Constitución.

Este tribunal consideró esta materia muy cuidadosamente en la causa de Julio Medina, que fué fallada en noviembre 25 de 1903. En dicha causa se falló que en vista de que la Ley Penal, bajo la cual fué procesado el demandado, había sido revocada en virtud de una ley subsiguiente de la Legislatura, que se consideró como un indulto legislativo, tendría que

ponerse en libertad al acusado y anularse la sentencia dictada. Pero Medina no fué acusado de haber publicado un artículo injurioso, o de haber abusado de la libertad de imprenta. Los hechos de esa causa demuestran que el delito atribuído fué la publicación de un periódico sin haber obtenido previamente una licencia de las autoridades municipales. Tal licencia era necesaria, según la antigua ley española, la cual, si bien no estaba en pugna con la Ley Orgánica de la Isla, fué revocada por una ley de la Asamblea Legislativa, decretada el 27 de febrero de 1902, titulada "Ley definiendo derechos del pueblo," y en su tercera sección preceptúa que no se coartará a nadie la libertad de la palabra y de la imprenta, y que toda persona en Puerto Rico tendrá la libertad de hablar, escribir o publicar lo que le plazca sobre cualquier asunto, siendo responsable, sin embargo, de todo abuso en que incurra de esa libertad, y cuya ley entró en vigor inmediatamente después de su aprobación.

Ni del examen de la ley, ni de la consideración de los argumentos aducidos por el letrado en el juicio, se advierte que este artículo 265 del Código Penal español sea, bajo ningún concepto, incompatible con las instituciones americanas, y (*) dicho artículo ciertamente es aplicable a las circunstancias del caso, que sirvieron de base a los procedimientos contra el procesado. Para hacer manifiesto o patente esto, basta solamente leer la ley en relación con el artículo publicado y por el cual fué convicto, y el que se expresa en el fallo de esta corte, confirmando la sentencia del tribunal inferior.

2. La segunda pretensión del peticionario de que la ofensa descrita en el artículo 265 del Código Penal, es un delito infame, y que por lo tanto, no debería estimarse al procesado por responsable del mismo, a no ser en virtud de una acusación hecha por un gran jurado, no puede considerarse como bien fundada. En primer término, el delito descrito y perseguido en el artículo 265 del Código español, penado con arresto mayor, no es un delito infame, pues no es de aquellos por los

que en caso de convicción podría aplicársele al acusado castigo corporal, sino simplemente una pena correccional.

Y este delito tampoco podría estimarse como infame, bajo las disposiciones del nuevo Código Penal, si éste fuera aplicable al mismo, porque la distinción entre *felonies* y *misdemeanors* se demuestra claramente en la sección 14 de dicha ley, la que a la letra dice:

"*Felony* es un crimen castigado con la pena de muerte o de presidio. *Misdemeanor* comprende todos los demás delitos."

Juzgado por esta ley, el delito del cual fué convicto el peticionario, es claramente un *misdemeanor*, puesto que el castigo del mismo no puede exceder de seis meses de cárcel. Ningún delito que sea menos grave que un *felony* puede estimarse como delito infame, de acuerdo con las disposiciones de la quinta enmienda de la Constitución de los Estados Unidos.

No hay dificultad ninguna, hoy en día, para determinar cuáles delitos son declarados infames, bajo la quinta enmienda de la Constitución de las Estados Unidos. Esa cuestión, que ha sido discutida por much tiempo, fué resuelta definitivamente (*) por el Sr. Juez Gray, en la causa de *Wilson ex parte,* referida en 114 U. S., pp. 425, 426. En aquella opinión clara el Tribunal Supremo dice:

"Pero por las razones arriba citadas, que se refieren al objeto y los términos de la primera disposición de la quinta enmienda, así como a la historia de su adopción, y a su primitiva inteligencia y práctica bajo la misma, este tribunal es de opinión que la capacidad del demandado, en el caso de que sea convicto, para servir como testigo en otra causa, no es una prueba verdadera; y que no puede hacerse responsable a ninguna persona, sin información o acusación por un gran jurado, por ningún delito que se pueda castigar por la corte con una pena infamatoria.

"La cuestión es, si el delito es uno de aquellos por el cual la corte queda autorizada por los estatutos a castigar con una pena infamatoria, y no, si la pena que últimamente se imponga, lo es. Cuando

el acusado se encuentra en el peligro de ser sometido a una pena in-
famatoria; si se le declarase culpable, él tiene el derecho de insistir
que no se celebre el juicio, excepto bajo la acusación de un gran
jurado.

"Ni podemos acceder a la proposición, que algunas vaces se ha
mantenido, que ningún delito es infame en el sentido de la Quinta
Enmienda, que no haya sido declarado por el Congreso. Véase *United
States* v. *Wynn*, 3 MacCrary, 266 y 11 Fed. Rep., 57; *United States*
v. *Petit*, 11 Fed. Rep., 58; *United States* v. *Cross*, 1 McArthur, 149.
El propósito de la enmienda fué limitar el poder de la Legislatura,
así como el de los Fiscales de los Estados Unidos.   *   *   *"

Se ha seguido uniformemente esta causa desde 1884, y
entre otros, en los casos de *United States* v. *Petit*, 114 U. S.,
429, y *Mackin* v. *United States*, 117 U. S., 348. Véase tam-
bién Miller on Constitution, p. 504, y 1 Rawle's Bouvier's
Dictionary, p. 1026.

El delito del cual se declaró culpable al solicitante bajo el
artículo 265 del Código Penal español, era punible con la pena
de arresto mayor.   Esta pena fué calificada como pena co-
rreccional, bajo el artículo 24 del Código Penal español.
Solamente las penas corporales corresponden, bajo dicho
código, (*) al castigo de *felonies* bajo la Ley Penal americana.
Esto aparece claramente al leer el artículo citado, que es como
sigue:

"Artículo 24. Las penas que pueden imponerse con arreglo a
este Código y sus diferentes clases, son las que comprende la si-
guiente escala general:

"*Penas aflictivas.*—Muerte, cadena perpetua, reclusión perpetua,
relegación perpetua, entrañamiento perpetuo, cadena temporal, re-
clusión temporal, relegación temporal, entrañamiento temporal, pre-
sidio mayor, prisión mayor, confinamiento, inhabilitación perpetua,
inhabilitación absoluta temporal, inhabilitación especial perpetua,
inhabilitación especial temporal.

"*Penas correccionales.* — Presidio correccional, prisión correccio-
nal, destierro, represión pública, suspensión de cargo, suspensión de
cargo público, derecho de sufragio activo y pasivo, profesión u oficio
y arresto mayor.

"*Penas leves.*—Arresto menor, reprensión privada.

"*Penas comunes a las tres clases anteriores.*—Multa, caución.

"*Penas Accesorias.*—Degradación, interdicción civil, sujeción a la vigilancia de la autoridad, pérdida o comiso de los instrumentos y efectos del delito, pago de costas."

Las penas corporales, según se han designado anteriormente, corresponden con las penas capitales e ignominiosas a que se refiere la quinta enmienda de la Constitución; y las penas correccionales, leves y accesorias, son de grado inferior. La pena de que se queja el peticionario, es correccional solamente, y no se castiga el delito por prisión en el presidio o la penitenciaría, sino solamente en la cárcel. De aquí que pudiera ser perseguido por información, y no necesitaría una acusación por un gran jurado, ni aun en los tribunales federales. Pero aparte de este aspecto de la causa, el artículo 5°. de las enmiendas de la Constitución de los Estados Unidos, no tiene aplicación a los tribunales insulares, y las acusaciones por un gran jurado para la declaración de culpabilidad del acusado, (*) en dichos tribunales, no son más necesarias de lo que lo serían en los tribunales de Estado, o de los territorios en los Estados Unidos. Este es un punto bien establecido por numerosos casos, según queda demostrado en los discursos del Juez Miller sobre la Constitución de los Estados Unidos, discurso 10, p. 493, donde dicho distinguido jurista, al hablar de la enmienda séptima, dice:

"Este artículo de las enmiendas de la Constitución, así como todos los demás, desde uno a ocho inclusive, se refiere al ejercicio del gobierno de los Estados Unidos y no al de los Estados. Esto ha sido decidido repetidas veces." Citando *Livingston* v. *Moore,* 7 Pet., 469; *The Justices* v. *Murray,* 9 Wall., 274; *Edward* v. *Elliott,* 21 Wall., 532.

Ni podrá aplicarse esta disposición en manera alguna a los tribunales insulares en Puerto Rico, hasta que sean convertidos en Cortes Federales por una ley del Congreso. *Reynolds,* v. *United States,* 98 U. S., 145; *Eilenbecker* v. *District*

*Court,* 134 U. S., 31; *United States* v. *Cruikshank,* 92 U. S., 542; *Walker* v. *Sauvinet,* 92 U. S., 90; *Fox* v. *Ohio,* 46 U. S., 410; *Holmes* v. *Jennison,* 39 U. S., 549; *Presser* v. *Illinois,* 116 U. S., 252; *In re Ross,* 140 U. S., 453; *Cook* v. *United States,* 138 U. S., 157; *Hurtado* v. *California,* 110 U. S., 516; *MacAllister* v. *United States,* 141 U. S., 174; *Permoli* v. *N. O.,* 44 U. S., 589.

No hemos podido encontrar ninguna resolución de la Corte Suprema que de un modo directo prescriba la condición de las cortes territoriales con arreglo a la enmienda 7ª. de la Constitución de los Estados Unidos; pero en el caso de *Walker* v. *S. P. R. R. Co.,* resuelto en 1896, el abogado presentó esta cuestión y el Juez Sr. Brewer, al redactar la opinión del tribunal, dijo:

"Juzgamos innecesario considerar la alegación que hace el demandado de que las cortes territoriales no son cortes de los Estados Unidos, y que la enmienda 7ª. no es de aplicarse a los territorios, porque el Congreso, por una ley de abril 7 de 1874, c. 80, 18 Stat., 27, (*) al legislar para todos los territorios, declaró que a ninguna parte 'se le privará del derecho de tener un juicio por jurado en los casos que hayan de resolverse con arreglo a la ley común;' y aunque esto no haga extensivas a los territorios, de modo terminante, todas las prescripciones de la enmienda 7ª. asegura todos los derechos de un juicio por jurado, tal y como ellos existían en la ley común." *Walker* v. *Southern Pacific R. R. Co.,* 165 U. S., 595, 596.

Se hizo referencia a esta causa, aprobándola en la causa posterior de *American Publishing Co.* v. *Fisher,* 166 U. S., 467.

Si la enmienda 7ª. tuviera aplicación a dichas cortes, es bastante probable que la resolución se hubiera basado en la Constitución más bien que en el estatuto; y podemos deducir lógicamente que la Corte Suprema no considera que las cortes territoriales sean cortes federales dentro de los límites de la enmienda 7ª.

Pero las Cortes Insulares de Puerto Rico, de jurisdicción original, tienen más analogía con las Cortes de los Estados

que con las de los territorios. No fueron creadas por una ley del Congreso, sino que existían antes de la aprobación de la Ley Foraker que las reconoció y las dejó en vigor. Véase la sección 33 de la Ley Orgánica. Puerto Rico no es un territorio, ni es Estado de la Unión americana, pero sus Cortes de Primera Instancia tienen muchas, si no todas, de las atribuciones de dichas cortes, y al firmarse el Tratado de París, y durante todo el período del Gobierno Militar, había en la Isla un completo sistema judicial que hasta la fecha presente se ha modificado solamente, sin que se haya cambiado del todo durante el Gobierno Civil.

Por estas razones, si la Constitución de los Estados Unidos estuviera vigente en Puerto Rico, no podría considerarse que la enmienda 7ª. tuviera aplicación a sus cortes, pues ellas estarían comprendidas en las decisiones mencionadas anteriormente, las que sostienen que esta enmienda no tiene aplicación a las cortes de los Estados.

Una institución como el gran jurado no ha sido nunca vista (*) en las cortes Insulares de Puerto Rico. Existen a la sazón unos mil prisioneros en la penitenciaría de Puerto Rico, a los cuales habría que soltar si se diese esta interpretación al Código Penal; sin embargo, si fuera necesario para hacer justicia en el presente caso, este tribunal no vacilaría en abrir las puertas de todas las cárceles de la Isla. Pero esa interpretación no está autorizada por autoridad alguna, de las que se han presentado ante esta corte, o pudieran encontrarse después de una diligente busca.

3. Se alega que al acusado le fué denegado el derecho a un juicio por jurado, cuyo derecho se lo garantiza la Constitución de los Estados Unidos. En relación a esta garantía constitucional, son aplicables las mismas observaciones contenidas en el párrafo anterior referentes a acusaciones por los grandes jurados. La enmienda sexta, en vez de la quinta, es la que está envuelta en este caso, y hé ahí la única diferencia. Pero el acusado, como está demostrado en los autos,

renunció a todo derecho a un juicio por jurado, de acuerdo
con las leyes de Puerto Rico y la Constitución de los Estados
Unidos, si las mismas fueren aplicables, por no haber hecho
una solicitud con aquel objeto, a su debido tiempo.  La ley
de jurados de Puerto Rico preceptúa que un acusado tiene
derecho a un juicio por jurado en todos los casos de delito
grave, siempre que así lo solicite cuando se haga la primera
lectura de la lista o relación de las causas, y se ponga la
de él en la correspondiente a jurados.  Véase el artículo 178
del Código de Enjuiciamiento Criminal.  Ninguna solicitud
referente a un jurado fué jamás presentada a favor del pro-
cesado antes o durante la acusación (*arraignment*), ni du-
rante más de una semana después, cuando su abogado defen-
sor se presentó ante el tribunal, tratando de excusar su negli-
gencia, y pidió un jurado, que le fué negado, porque el delito
de que se le había acusado era solamente un delito menos
grave y no *felony*, y además, porque no había pedido o soli-
tado el jurado dentro del término (*) prescrito por la ley, y
por lo tanto, había renunciado a su derecho, si es que tenía
alguno.  Los autos en este proceso sostienen ampliamente
esta proposición, y una ligera ojeada dada a los mismos es
suficiente para demostrar que una petición o solicitud de esa
naturaleza carece de base en que fundarse.

4. El cuarto motivo alegado por el peticionario de que
los procedimientos en la corte de distrito no constituían un
procedimiento legal en debida forma, como lo preceptúa la
Constitución de los Estados Unidos, parece simplemente una
repetición de las aserciones del segundo y tercero, con pro-
bable alusión al quinto y sexto motivo de esta solicitud;  al
menos no se ha invocado en la solicitud, ni citado en el in-
forme oral del letrado defensor, al presentar la causa a este
tribunal, ninguna otra disposición constitucional, ni legal.
Sin embargo, puede ser que por el uso del término ''procedi-
miento legal en debida forma'' se haya hecho referencia a la

enmienda catorce de la Constitución de los Estados Unidos, que dice:

"Ni tampoco privará ningún Estado a persona alguna, de su vida, libertad, ni bienes, sin un procedimiento legal en debida forma; ni denegará a ninguna persona, dentro de su jurisdicción, la uniforme protección de la leyes."

Esto es claramente una limitación de los poderes de las Legislaturas de los Estados y no puede tener referencia a Puerto Rico. En el discurso trece de Miller sobre la Constitución, se discute esta enmienda, y el distinguido autor se expresa en la forma siguiente:

"Aquella enmienda fué ordenada para asegurar iguales derechos a todas las personas. Para llevar a cabo el objeto de la misma, el Congreso está investido del poder de hacer cumplir sus disposiciones mediante una legislación adecuada. Por otra parte, no fué ideada para poner obstáculos al poder del Estado para proteger la vida, libertad y los bienes de sus ciudadanos, ni al ejercicio de ese poder en las adjudicaciones (*) de los Tribunales del Estado, al instruir los procedimientos dispuestos por sus leyes. Por lo tanto, cuando una persona acusada de un delito dentro de un Estado es sometida, al igual de todas las demás personas, en dicho Estado, a la ley, en el curso ordinario de su administración en los tribunales de justicia, el fallo que resulte en esta forma, no puede considerarse como un ejercicio de poder arbitrario y sin restricción, y por eso nulo y sin ningún valor." *Virginia Ex parte*, 100 U. S., 339. *In re Converse*, 137 U. S., 624. Miller on the Constitution, 658, 659.

La eminente autoridad continúa diciendo:

"La ley, en su curso ordinario de administración por los tribunales de justicia, constituye un procedimiento legal en debida forma, y cuando está asegurada por las leyes del Estado, se han llenado los requisitos de la enmienda catorce. El procedimiento legal en debida forma, según el sentido de dicha enmienda, está asegurado si las leyes se aplican a todos de igual modo, y si, por ellas, no se somete al individuo a un ejercicio arbitrario de los poderes del Gobierno." *Leeper*

v. *Texas,* 139 U. S., 462; Miller on the Constitution, p. 664.  Véase también Miller sobre la Constitución, p. 675, como un caso análogo.

Según las autoridades citadas, y después de resumir todo lo que se refiere al punto que trata de sostener el letrado defensor, en su solicitud, nos vemos obligados a declarar que el solicitante en el presente caso, no puede quejarse de que los trámites del tribunal de distrito no fueran practicados de acuerdo con un procedimiento legal en debida forma, y que todo derecho que tuviera, y que persona alguna pudiera reclamar bajo la enmienda catorce de la Constitución, o bajo cualquiera otra sección de aquel documento, le ha sido concedido y cuidadosamente guardado en el juicio de esta causa.

5. El quinto motivo alegado por el peticionario, para que se le ponga en libertad bajo el auto de *habeas corpus,* se refiere a la competencia del juez especial de la corte de distrito, que fué nombrado para reemplazar al juez en propiedad de dicho tribunal que estaba inhabilitado, porque era uno de los jueces a quien el acusado había atacado en el artículo (*) por cuya publicación fué procesado.  Se alega que el juez especial de dicho tribunal, aunque fué nombrado por el Gobernador, no fué nunca confirmado por el Consejo Ejecutivo, lo cual, según se pretende, era necesario con arreglo a la Ley Orgánica.  Si es que la Ley Foraker exige que un juez especial de un tribunal de distrito, sea no solamente nombrado por el Gobernador, sino también confirmado por el Consejo Ejecutivo, no hay nada en los autos que demuestre que este juez no fué confirmado por el Consejo Ejecutivo. El fué nombrado en debida forma por el Gobernador, y si fué confirmado o no por el Consejo Ejecutivo, no consta afirmativamente, ni tampoco los autos contienen nada en sentido contrario, y por lo tanto, hay que presumir concluyentemente que fué confirmado, si es que la ley lo exigió.  En otras palabras, el hecho de que un juez estaba funcionando en debida forma en el tribunal de distrito, en unión con otros

dos, cuyo nombramiento no se pone en duda, y quienes tomaron parte en el juicio bajo la dirección del Fiscal General, con arreglo a lo dispuesto por la ley, a lo menos autoriza la presunción de que fué nombrado y confirmado legalmente y en debida forma. De todos modos, este fallo era el de un tribunal *de facto,* y no hay ley que justificaría a este tribunal en un procedimiento de *habeas corpus,* de investigar la legalidad de su nombramiento.

La Suprema Corte de los Estados Unidos establece esta doctrina en los términos siguientes:

"No se puede decir que se haya denegado a una persona la uniforme protección de las leyes, ni que haya sido privado de su libertad, sin un procedimiento legal en debida forma, en violación de la enmienda décimacuarta, por haber sido juzgada y sentenciada a prisión por un juez que, aunque haya sido nombrado por el Gobernador, sin autoridad para ello, es un juez *de facto* de un tribunal *de jure,* por la ley del Estado, según se ha declarado por el tribunal más alto del mismo." *In re Manning,* 139 U. S., 504; Miller's Lectures, p. 673.(*)

Tan recientemente como en el año 1898, esta doctrina ha sido reafirmada por el Tribunal Supremo de los Estados Unidos, en la causa de *Henry Ward, ex-parte,* en la cual el Juez Presidente Fuller, al pronunciar el fallo del tribunal, dice:

"No necesitamos, sin embargo, considerar el amplio alegato del abogado defensor con respecto a este punto, puesto que nosotros consideramos aplicable al presente caso la regla bien establecida de que en los casos en que el tribunal tenga jurisdicción sobre un delito y sobre el acusado, si los procedimientos por otra parte se ajustan a la ley, una declaración de culpabilidad es legal, aunque el juez que presida el tribunal sea solamente un juez *de facto;* y que la validez del derecho de tal juez al cargo como tal, o su derecho de ejercer las funciones judiciales, no pueden ser determinados al presentarse un auto de *habeas corpus.*" *Henry Ward, ex parte,* 173 U. S., 454.

Es verdad que con arreglo a la antigua ley española, en un recurso de apelación interpuesto contra una sentencia dictada, tal como el anterior recurso interpuesto contra la primera declaración de culpabilidad en esta causa, se investigaba la competencia de un juez especial de un tribunal de distrito; pero ese no era un caso de *habeas corpus,* y tal investigación se hizo únicamente, con arreglo a las expresas disposiciones del Código español, que no son aplicables a procedimientos de *habeas corpus,* sino solamente a recursos de apelación. Resulta, pues, que todas las presunciones deben ser a favor de la legalidad del nombramiento del Juez Especial García, y de la validez de la sentencia que él dictó en unión con los otros jueces, y esa sentencia no puede atacarse colateralmente en un procedimiento de *habeas corpus.*

6. El sexto motivo alegado por el peticionario, para que se le ponga en libertad, es que no fué declarado culpable a consecuencia de un procedimiento legal en debida forma; porque él alega que el segundo juicio, en que fué declarado culpable por segunda vez, tuvo lugar en octubre de 1903, y que en primero de julio de 1902 había empezado a regir una nueva Ley de Enjuiciamiento Criminal, y que debía habérsele juzgado (*) con arreglo a dicha ley. Este tribunal ha declarado repetidas veces que la nueva Ley de Enjuiciamiento Criminal, que fué adoptada en primero de marzo de 1902 y empezó a regir el primero de julio del mismo año, no podía aplicarse a hechos o delitos perpetrados y cometidos con anterioridad al primer día de julio de 1902. El delito de que se declaró culpable al peticionario, fué cometido en trece de febrero de 1902, antes de que se adoptara la ley a que él se refiere, y mucho antes de que empezara a regir, y según numerosas decisiones de este tribunal, y especialmente la pronunciada en la causa de *Mauleón, ex parte,* que en la actualidad está pendiente ante el tribunal de los Estados Unidos, el nuevo Código de Enjuiciamiento Criminal no podía aplicarse

a delitos cometidos con anterioridad a la fecha en que empezó a regir.

Se ha decidido repetidas veces por este tribunal, que el Código de Enjuiciamiento Criminal y el Código Penal, que fueron adoptados el primer día de marzo de 1902, para empezar a regir al medio día del primero de julio siguiente, nò regía en cuanto a la persecución y castigo de delitos cometidos con anterioridad a esta fecha. Las razones para esta decisión se hallan consignadas en el amplio dictamen concurrente emitido por el Juez MacLeary, en la causa de *Mauleón, ex parte,* que fué decidida por este tribunal en 9 de octubre de 1903, y contra cuya decisión se interpuso por el peticionario recurso de apelación para ante el Tribunal Supremo de los Estados Unidos; será conveniente, sin embargo, resumirlas aquí sucintamente. La interpretación que se ha dado a estos códigos, está de acuerdo con la manifiesta intención de la Legislatura, según se deriva de los mismos códigos, de la historia contemporánea y de las circunstancias que prevalecían en esa época. *Church of H. T.,* v. *United States,* 143 U. S., 457; *Siemens's* v. *Sellers,* 123 U. S., 276; *United States* v. *U. P. R. R. C.,* 91 U. S., 72; *Aldridge* v. *Williams,* 3 How., 8; de la anterior condición de los estatutos o leyes que existían en la Isla. *Ross, ex parte,* 140 U. S., 453; *Platt* v. *U. P. R. R. Co.,*(*) 99 U. S., 48, de la interpretación contemporánea por funcionarios ejecutivos encargados de su ejecución. *United States* v. *Healy,* 160 U. S., 136; *People* v. *Dayton,* 55 N. Y., 377; *Wetmore* v. *State,* 55 Ala., 198; *United States* v. *A. G. S. R. R. Co.,* 142 U. S., 615; *United States* v. *Johnston,* 124 U. S., 236, y de una aversión a cambiar una larga serie de decisiones, envolviendo graves consecuencias para la Administración de Justicia. Sutherland on Statutory Construction, sección 314, 323; *In re Warfield,* 22 Cal., 51; *Broker* v. *Lorrilard,* 4. N. Y., 261; *Rogers* v. *Goodwin,* 2 Mass., 477. En el dictamen citado, se hace también referencia a *Soon Hing* v. *Crowley,* 113 U. S., 703; *King* v.

*Gallum,* 109 U. S., 99; *Wisconsin Central R. R. Co.,* v. *Forsythe,* 159 U. S., 46; *United States* v. *Clarke,* 8 Pet., 436; *Territory* v. *Commissioners,* 8 Mon., 409, 411; *Foster* v. *Blount,* 18 Ala., 687; *Phillips et al.* v. *Detroit,* 111 U. S., 604; *United States* v. *Perot,* 98 U. S., 428; *Conger* v. *Weaver,* 6 Cal., 548; *Sparrow* v. *Strong,* 3 Wall., 97; *Tavner* v. *Patton,* 49 Ala., 406; *Stockton School District* v. *Wright,* 134 Cal., 68; *People* v. *Craycroft,* 111 Cal., 544; *Carpy* v. *Dowdell,* 129 Cal., 245; *Merced Bank* v. *Cassacia,* 103 Cal., 645; *People* v. *Curry,* 130 Cal., 94; Black on Interpretation of Laws, 112; Bishop's Criminal Law, 19; *United States* v. *Webster, Davies,* 38; *Fosdick* v. *Perrysburg,* 14 Ohio St., 473; y otras autoridades. Puesto que los códigos han sido copiados del Código Penal de California, que en su original es una sola ley, y puesto que tiene el mismo objeto a saber: el de establecer en la Isla de Puerto Rico un sistema de leyes criminales americanas, derogando el anterior sistema español, y siendo por tanto *in pari materia,* deben ser interpretados juntamente, y si es posible, debe hacerse que funcionen en armonía, debiéndoselos interpretar de tal manera que no estén en contradicción con los principios generales de la ley, que no son de presumirse que la Legislatura los haya querido cambiar. Puesto que los dos códigos constituyen un sólo sistema, y siendo imposible separarlos el uno del otro,(*) debe presumirse que empiezan a regir a un mismo tiempo, con respecto a cualquiera causa o clase de causas, que se presente y esté comprendida en los mismos; y puesto que el Código Penal dispone especialmente que no afectará a los delitos cometidos con anterioridad al primero de julio de 1902, debe interpretarse el Código de Enjuiciamiento Criminal en el sentido de que contenga la misma disposición. *Manuel* v. *Manuel,* 13 Ohio St., 458, 465; *Smith* v. *People,* 47 N. Y., 330; *Whitcomb* v. *Rood,* 20 Vt., 49; *McDougal* v. *Dougherty,* 14 Ga., 674; *Hays* v. *Richardson,* 1 Gill and J., 366; *Noble* v. *State,* 1 Green, 325; *Lane* v. *Missoula County,* 6 Mont., 482;

*Carruthers* v. *Madison County,* 6 Mont., 483; *Thorpe* v. *Schooling,* 7 Nev., 17.   En lo que respecta a este fundamento de la solicitud, este caso es exactamente igual al de Mauleón, y las discusiones contenidas en los dictámenes emitidos en aquel caso, son aplicables al presente y no es necesario repetirlas aquí.

7. El séptimo motivo que alega el peticionario para que se le ponga en libertad, es una repetición de su alegación con respecto al derecho que pretende tener a un juicio por jurado, excepto que él .reclama dicho derecho "bajo las disposiciones del capítulo 10 del Código Penal de Puerto Rico," que se dice haber empezado a regir el primer día de julio de 1902.   Dicha ley dispone expresamente que no tiene referencia alguna a delitos cometidos con anterioridad a esa fecha, y tanto por esta razón, cuanto por otras expresadas anteriormente en la presente, especialmente bajo el tercer motivo de la solicitud del acusado, éste no tenía derecho a un juicio por jurado, y no se ha cometido ningún error al denegar su solicitud, en que lo pidió.  Sin embargo, examinaremos la cuestión bajo el punto de vista del peticionario, para darle el pleno beneficio de todas sus reclamaciones.

Los abogados defensores del acusado, se refieren en su alegato al capítulo 10 del Código Penal de Puerto Rico, sin expresar el título, ni la sección del código.   En dicho código (*) hay tres capítulos marcados con el número diez, uno en el título 12, con respecto a libelo; otro en el título 13, referente a dueños de casas de préstamos; y otro en el título 17, con respecto a pesos y medidas falsas.   El primero de los tres capítulos mencionados, es probablemente al que dichos abogados tenían la intención de referirse, y hay que presumir que la sección 246 es la que tenían presente y que dice lo siguiente:

"En todos los procesos promovidos por libelo, se podrá testificar la verdad ante el tribunal o jurado, y si éste estimare ser cierto lo

denunciado como infamatorio, y haberse publicado con sana inten-
ción, y para fines justificables, deberá absolverse libremente al acu-
sado, incumbiendo al jurado determinar las cuestiones de hecho y de
derecho.''

Por cuanto la ley del jurado que ha sido incorporada en
el Código de Enjuiciamiento Criminal, dispone que ninguna
persona tiene derecho a un juicio por jurado cuando esté
acusada solamente de *misdemeanor* (y libelo es solamente
un *misdemeanor* con arreglo al código), la sección anterior-
mente citada no puede, por implicación, dar al acusado el
derecho de pedir un jurado en una causa promovida por
libelo. El simple hecho de que se haga esa cita, no contradice
a la ley del jurado, puesto que hay que interpretarla en el
sentido de que, siempre que en adelante se disponga que las
causas promovidas por libelo sean juzgadas por un jurado,
dicho jurado tendrá el derecho de determinar la ley y los
hechos. En el caso de que el derecho a un juicio por jurado,
fuere hecho extensivo a los acusados en causas por *misde-
meanor,* o si el delito de libelo fuese declarado *felony,* enton-
ces podría aplicarse esta sección, pero mientras no se hagan
estos cambios en las leyes, dicha cita no puede tener la fuerza
o efecto que se trata de darle por el peticionario en este caso.
Ciertamente, bajo ningún punto de vista de la causa pudiera
haberse concedido un jurado al acusado en el juicio en que
fué declarado culpable. Esto, sin embargo, no (*) es muy
importante para la discusión, puesto que hay que recordar
que el acusado no lo fué por libelo, y que no fué juzgado
ni declarado culpable por dicho delito, sino por otro comple-
tamente distinto.

8. El octavo motivo que alega el acusado en apoyo de su
solicitud, no tiene ningún fundamento de hecho y es positi-
vamente falso. Un examen del dictamen del tribunal demos-
trará, y es un hecho, que de acuerdo con la ley de 12 de marzo
de 1903, este tribunal examinó cuidadosamente todos los autos

para determinar si había algún punto legal o de hecho a favor del acusado, sobre el cual podría basarse una revocación de la sentencia. Los autos no demostraron ningún incidente en que se hubieran violado los derechos del acusado, no existiendo procedimiento alguno del que pudiera quejarse con razón. No obstante el hecho de que los abogados del acusado en la vista de esta causa en apelación, solamente presentaron dos proposiciones al tribunal, en el informe oral, el tribunal examinó minuciosamente los autos de un extremo a otro, y discutió todos los puntos que surgían de los mismos, en un extenso dictamen que forma parte del expediente en esta causa, y que ampliamente refuta el ataque hecho en esta parte de la solicitud. Celo en el interés de su cliente, por parte de un abogado defensor, debe siempre recomendarse, pero cualquier desvío de los hechos contenidos en los autos, es imperdonable.

9. El noveno motivo de que el fallo y sentencia del Tribunal Supremo sea irregular y nulo, por las diferentes razones enumeradas anteriormente, es simplemente un resumen de lo que se ha dicho ya, y no necesita ulterior consideración, a excepción de decir que nunca ha sido decidido por el Tribunal Supremo de los Estados Unidos, que "la Constitución sigue a la bandera." En toda extensión de territorio que hasta ahora ha sido adquirida por los Estados Unidos, antes de que la Constitución, con todos sus poderes y restricciones pudiera considerarse aplicable al Gobierno, tribunales y (*) pueblo de tal territorio, se ha considerado necesario que el Congreso adopte alguna medida en el asunto, ya sea estableciendo una ley directa, por la cual los beneficios de la Constitución se hacían extensivos a dicho territorio, o ya asintiendo tácitamente a medidas tomadas en este sentido, por otros ramos del Gobierno. El Congreso no ha adoptado semejante ley con respecto a Puerto Rico, y no existe tal asentimiento. Se podrá decir, y nosotros creemos que es el caso, que ciertos derechos personales del ciudadano indi-

vidualmente, por el mero hecho de la posesión americana, se hacen extensivos a cada persona que resida dentro de la jurisdicción de los Estados Unidos. Esos derechos son tales como el de dar culto según los dictados de su propia conciencia, el derecho de estar seguro en cuanto a su casa, persona, documentos y efectos, contra registros y secuestros irrazonables, y la uniforme protección de las leyes; pero otras disposiciones de la Constitución, que se refieren a la condición política, derechos civiles, ciudadanía o sufragio y otras cosas por el estilo, no tienen ninguna referencia a un pueblo que habita una isla o una extensión de territorio que ha sido adquirido por conquista, por descubrimiento, por un tratado, o de otra manera. Y si fuese necesario invocar aquel documento, se podrá fácilmente ver y comprender por el Tratado de París mismo, que la condición del pueblo de Puerto Rico, en cuanto a sus derechos civiles y condición política, depende enteramente de la voluntad del Congreso, según se expresa en la ley. Véase el Tratado de París, artículo 9; y hasta que el Congreso tenga por conveniente hacer las disposiciones de la Constitución de los Estados Unidos y las leyes adoptadas a consecuencia de las mismas, extensivas a los habitantes de esta Isla, éstos deben limitarse a gozar de la libertad que les ha sido concedida por la Ley Orgánica, por la cual se les han dado los privilegios de una autonomía limitada y de un gobierno civil.

El mero hecho de que los Estados Unidos son una república en vez de monarquía, no priva a su gobierno del poder (*) de declarar y hacer guerra, de extender sus confines, de hacer conquistas, de hacer tratados y de adquirir territorio en tal forma como les parezca más prudente y conveniente, a los poderes ejecutivo y legislativo. Es, por supuesto, de presumirse que un gobierno libre, como lo es el de los Estados Unidos, al adquirir territorio, concederá a la población del mismo, mayor suma de libertades de las que anteriormente gozaba bajo un régimen monárquico; pero el sostener

que los habitantes de tal territorio tengan en seguida, inmediatamente después de la ocupación por los ejércitos del Gobierno americano, todos los derechos de ciudadanía que los ciudadanos primitivos de la república adquirieron por herencia de sus antepasados, no está autorizado por nada, en la Constitución, ni en las leyes de los Estados Unidos, ni en las instituciones, que en el progreso de trece décadas, han nacido bajo la protección de aquella Constitución y de aquellas leyes.

Hasta que el Congreso establezca una ley, haciendo la Constitución de los Estados Unidos extensiva a Puerto Rico, o hasta que el Tribunal Supremo de los Estados Unidos declare que dicha constitución está en plena fuerza y vigor aquí, este tribunal debe conformarse con administrar las leyes de esta Isla, tales como se encuentran en los códigos y estatutos y no tratar de usurpar funciones legislativas o ejecutivas, al ir en pos del fantasma de derechos imaginarios.

Nosotros deducimos de los dictámenes sobre casos insulares contenidos en 182 U. S. Reports, las proposiciones siguientes:

(a) Considerando los diferentes y numerosos tratados, por los cuales el Gobierno americano ha adquirido territorio extranjero, a la luz de las circunstancias que prevalecían en la época en que fueron celebrados, vemos que el poder que celebraba el tratado, carecía siempre de autoridad para incorporar el territorio en los Estados Unidos, sin el consentimiento expreso o implícito del Congreso nacional.

(b) Cuando un tratado no contiene estipulaciones respecto (*) a la incorporación, y sobre todo, cuando no solamente no tiene tales estipulaciones, sino que expresamente dispone lo contrario, entonces la incorporación no procede sino hasta que, en la opinión del Congreso, el territorio adquirido haya llegado a tal estado, que sea conveniente que entre en la familia americana, formando parte de ella.

(c) Las disposiciones de la Ley Foraker, consideradas en su totalidad, claramente manifiestan la intención del Con-

greso de que, por lo menos en la actualidad, Puerto Rico no ha de ser incorporado a los Estados Unidos.

En el reciente caso de la González, en que se interpuso recurso de apelación para ante el Tribunal Supremo de los Estados Unidos, contra el fallo dictado por el Tribunal de Circuito de los Estados Unidos, en Nueva York, el tribunal primeramente citado, declaró que la persona que quería inmigrar en los Estados Unidos, o sea la González, no era una extranjera en el sentido dado a esta palabra en las leyes de inmigración, pero, al mismo tiempo, no declaró que ella era ciudadana de los Estados Unidos, dejando así la condición de los puertorriqueños, en cuanto a la ciudadanía, en el mismo ser y estado en que había sido colocada por la Ley Foraker, y las decisiones en los Casos Insulares. Cualesquiera que sean las aspiraciones que nuestro pueblo tenga con respecto a ciudadanía, gobierno de la Isla por sí misma, gobierno territorial, y a que se declare la Isla Estado de la Unión, esas aspiraciones deben dirigirse al Congreso nacional, o al menos, a alguna otra autoridad que no sean los tribunales insulares, los cuales están obligados a juzgar las cuestiones sometidas a ellos, de acuerdo con las leyes vigentes.

Aunque se sostuvo por el abogado defensor del acusado, en su informe oral, que esta petición había de concederse o negarse, con arreglo a las disposiciones de la Constitución de los Estados Unidos, y la sección trigésimaquinta de la Ley Orgánica, que confiere a este tribunal la facultad de expedir (*) autos de *habeas corpus;* y que la Legislatura de Puerto Rico no podía ni aumentar ni restringir los poderes conferidos por dicha Constitución y Ley Orgánica, sin embargo, no creemos que esa afirmación esté bien fundada. Por cuanto la Legislatura de Puerto Rico tiene la facultad de legislar en cuanto a la jurisdicción y procedimiento de los tribunales, y ha adoptado una ley referente a *habeas corpus* que establece todos los bien conocidos principios de la ley americana, aplicables a este gran auto y cuanto a la solicitud de dicho

auto y la concesión del mismo, nosotros creemos que es el deber de este tribunal cumplir con esa ley, y nosotros la examinaremos para ver si hay algo contenido en la misma que autorice al peticionario para pedir que se le ponga en libertad.

Las leyes con respecto a *habeas corpus,* aplicables a este caso, son especialmente las secciones 482 y 483 del Código de Enjuiciamiento Criminal, que dicen lo siguiente:

"Artículo 482. Si no ha expirado el tiempo durante el cual puede estar detenida legalmente una persona, el juez o tribunal ordenará que continúe detenida dicha persona, si resulta que está detenida o en custodia:

"1. En virtud de mandamiento expedido por el juez del tribunal de distrito de los Estados Unidos, en los casos que dicho tribunal o juez tenga competencia exclusiva, o

"2. En virtud de orden de arresto o sentencia firme o decreto de cualquier tribunal competente en la jurisdicción criminal, o de cualquier mandamiento expedido en virtud de dicha orden de arresto, sentencia o decreto.

"Artículo 483. Si resulta del auto diligenciado que el preso está en custodia en virtud de mandamiento de cualquier tribunal o juez de Puerto Rico, o funcionario del mismo, el preso puede ser excarcelado en cualquiera de los casos siguientes, con sujeción a las prescripciones del artículo anterior:

"1. Cuando se ha traslimitado la jurisdicción de tal tribunal o funcionario.

"2. Cuando siendo legal en su origen el arresto, ha tenido lugar (\*) después alguna acción, omisión o suceso por el cual la persona arrestada se haya hecho acreedora a su excarcelación.

"3. Cuando el mandamiento es defectuoso en algún requisito fundamental de los que la ley exige, produciendo por este hecho la nulidad.

"4. Cuando el mandamiento, no obstante ser correcto en su forma, se ha expedido fuera de los casos permitidos por la ley.

"5. Cuando la persona que tenga en custodia al preso, no es la persona autorizada por la ley para detenerlo.

"6. Cuando el mandamiento no está autorizado por ninguna prescripción de la ley, sentencia o decreto de algún tribunal.

"7. Cuando se ha encarcelado una persona bajo una acusación criminal sin causa razonable o probable para ello."

Del examen de estas secciones resulta claramente que la única sección aplicable a este caso, es el primer párrafo de la sección 483, por la que se declara que "cuando se haya excedido la jurisdicción de tal tribunal o funcionario" se podrá poner en libertad al acusado.　No puede haber duda después de una revista minuciosa de todos los autos, y de las razones alegadas por el peticionario, para que se le ponga en libertad, que en este caso el tribunal de distrito tenía jurisdicción sobre el delito denunciado, sobre la persona del acusado y sobre el asunto de que se trataba en esta causa, que no se había excedido la jurisdicción en lo más mínimo, y que el Tribunal Supremo tenía jurisdicción de apelación para decidir dicho asunto al interponerse el recurso de apelación.

No se ha demostrado nada en la solicitud, ni en el alegato, que pueda atacar con éxito esta jurisdicción o la forma en que se ha ejercido, y tanto por esta razón, cuanto por otras expresadas en la presente, la solicitud no puede prevalecer.

La mayoría de los puntos alegados en esta solicitud, atacan más bien el método de procedimiento, que no la jurisdicción de los tribunales que dictaron la sentencia, por la cual el acusado fué declarado culpable, y de esta manera tratan de apartar el objeto del auto de *habeas corpus* de su primitivo propósito de libertar al peticionario de una sujeción o encarcelación (*) ilegal, de modo que haga las veces de un recurso de error o de apelación.　Es un principio elemental, que esto no es posible, y en apoyo de esto, no creo que sea necesario citar autoridades; sin embargo, podrá hacerse referencia a algunas: *Storti* v. *Massachusetts,* 183 U. S., 141; *Minnesota* v. *Brundage,* 180 U. S., 499; *Markuson* v. *Boucher,* 175 U. S., 184; *Tinsley* v. *Anderson,* 171 U. S., 101; *Baker* v. *Grice,* 169 U. S., 284.

El Juez Taft, en la causa de *In re* McKnight, en 52 Federal

Reporter, página 801, dijo muy bien, que  *  *  *  ''Antes de
que un tribunal pueda intervenir mediante *habeas corpus,* en
la sentencia dictada por otro tribunal, deberá poder decir que
dicha sentencia es nula y sin ningún valor.'' También se ha
dicho por el Tribunal Supremo de los Estados Unidos, que
cuando la objección que se haga contra una sentencia, sola-
mente se refiere a la regularidad de los procedimientos que
dieron por resultado el juicio, y no a la jurisdicción del tribu-
nal de hacer ejecutar la sentencia, tal irregularidad no hace
nula la sentencia. *Harding ex parte,* 120 U. S., 782. No hay
nada en estos autos, que invalide la sentencia y apoye la
solicitud.

Habiendo examinado minuciosamente todas las reclama-
ciones hechas por el peticionario, para que se le ponga en
libertad, e investigado las cuestiones presentadas en su causa,
aun más detenida y extensamente de lo que ha indicado el
abogado defensor en su alegato, y habiendo buscado en vano
algún motivo por el cual se pudiera poner en libertad al acu-
sado sin encontrar alguno, la petición de *habeas corpus* debe
ser denegada.

*Denegada.*

Jueces concurrentes: Sres. Presidente Quiñones y Aso-
ciados Hernández y Figueras.

Juez disidente: Sr. Sulzbacher.

#### OPINIÓN DISIDENTE DEL JUEZ ASOCIADO SR. SULZBACHER.

Es ésta una solicitud de *habeas corpus* formulada por (*)
Hobart S. Bird, quien el día 21 de octubre de 1903, a con-
secuencia de un segundo juicio celebrado en esta causa, fué
declarado culpable en la Corte de Distrito de San Juan del
delito de injurias a la autoridad, de acuerdo con el artículo
265 del antiguo Código Penal. Interpuso apelación para ante
este tribunal, confirmándose la sentencia dictada por la corte
de distrito en 27 de febrero de 1904. No formé parte del

tribunal cuando la causa vino ante el mismo en apelación, ni tomé parte alguna en su resolución. La causa fué devuelta a la corte de distrito y el acusado Bird fué arrestado y conducido a la cárcel para cumplir la sentencia que le fuera impuesta.

Obtuvo un auto de *habeas corpus* de esta corte, y después de argumentarse el caso, la mayoría del tribunal denegó la solicitud. Soy de opinión que ha debido declararse con lugar la solicitud y ponerse al prisionero en libertad. A los fines de mi opinión disidente, considero necesario hacer una relación de los hechos esenciales del caso desde su origen.

La acusación fué presentada ante la Corte de Distrito de San Juan en el mes de marzo de 1902, y el acusado fué declarado culpable por dicha corte, en 19 de septiembre. Contra esta sentencia interpuso apelación para ante este tribunal, el que, por resolución de noviembre 25, 1903, revocó la sentencia dictada por la corte de distrito y ordenó la celebración de un nuevo juicio. Estuve conforme en la revocación de la sentencia y en una ópinión que separadamente emití, expresé las razones que tuve para ello. Según la ley, la corte de distrito está compuesta de tres jueces, pero en el juicio uno de los jueces sirvió en calidad de juez especial o suplementario. El Juez Presidente Sr. Quiñones y los Sres. José C. Hernández y José Ma. Figueras, resolvieron que, de acuerdo con cierto Real Decreto de España, y que aun está vigente en Puerto Rico, el acusado tenía que ser notificado por lo menos 24 horas antes de la celebración del juicio, de que un juez substituto habría también de formar tribunal (*) en el juicio de su causa, y que no habiéndose hecho esta notificación tenía que ordenarse la celebración de un nuevo juicio. Yo sostuve que no podía formar parte del tribunal en ningún caso, ningún juez substituto o especial y que la sentencia tenía que ser revocada.

Durante el tiempo transcurrido entre la época en que se cometió el supuesto delito y el día del juicio, la Legislatura

Insular aprobó un nuevo Código Penal, y otro de Procedimientos los que, según sus disposiciones, empezaron a regir el día primero de julio de 1902, conteniendo en substancia, la disposición de *que todos los delitos cometidos con anterioridad a aquella fecha deberían perseguirse de la misma manera que si la nueva ley no hubiera sido aprobada.* Este tribunal, en el caso de *Ex parte Mouleón,* resolvió con fecha 29 de octubre de 1903, que con respecto a los delitos cometidos con anterioridad al primero de julio de 1902, el antiguo Código de Enjuiciamiento Criminal era el *único* aplicable, expresando que:

"No existe, pues, duda alguna de que el nuevo Código Penal y la nueva Ley de Enjuiciamiento Criminal constituyen partes integrantes de un mismo sistema y están íntimamente relacionados. Está generalmente admitido que el primero define el crimen y establece el castigo, mientras que la segunda prescribe la forma, el método y los procedimientos que deben seguirse para el cumplimiento de la misma. A este tribunal no le cabe duda de que fué la intención de la legislatura el que el artículo 558 se considerarse como una 'cláusula de reserva,' toda vez que en ella se expersa en términos positivos e inequívocos, que todo acto u omisión cometido con anterioridad a la aprobación del código, podrá 'investigarse, perseguirse y castigarse como si no se hubiera aprobado este código'. Por consiguiente, los preceptos del nuevo Código Penal y de Enjuiciamiento Criminal no podían aplicarse a todos los delitos o faltas cometidos antes del día 1º. de julio de 1902, y dichas leyes habían de considerarse como si no hubieran existido absolutamente."

El nuevo sistema criminal fué copiado de los estatutos de Montana y California, pero la ley insular prescribe que *en* (*) *casos de "misdemeanors" no procederá apelación de la corte de distrito para ante el Tribunal Supremo.* Por esta razón, únicamente son apelables los delitos *felony* y cuando en ellos se interponga apelación, este tribunal, siguiendo la práctica generalmente seguida en los Estados Unidos, bajo códigos modernos semejantes, puede considerar solamente aquellos

errores que se hubieran señalado o reservado por medio de
un pliego de excepciones, a no ser que de otro modo aparezcan
manifiestos en autos, después de haberse presentado mociones
en solicitud de un nuevo juicio o para casar la sentencia, res-
pectivamente. Pero toda vez que un delito *misdemeanor* no
es apelable para ante el Tribunal Supremo, sería inútil que
un acusado hiciera objeciones a las decisiones del tribunal
sentenciador, y él tendría que aceptar sin remedio alguno
todos sus errores.

El antiguo procedimiento criminal, o sea la ley española,
según se modificara por las órdenes militares, y que estuvo
vigente hasta el día 1 de julio de 1902, y era aplicable a todos
los crímenes y delitos cometidos con anterioridad a esa fecha,
es enteramente distinto de aquel contenido en la nueva ley.
Toda causa criminal que tuviera su origen ante la corte de
distrito era apelable para ante el Tribunal Supremo, y de-
clarado culpable un acusado, tenía 10 días durante los cuales
podía presentar su moción interponiendo apelación y la sen-
tencia no adquiría el carácter de firme hasta después de haber
transcurrido estos días. La distinción que hace la jurispru-
dencia moderna entre *felonies* y *misdemeanors* no era cono-
cida al derecho español, ni existía tal distinción durante la
vigencia del mismo. Los dos sistemas criminales eran tan
completamente distintos y diferentes, que sería incorrecto y
sin fundamento legal alguno, que una persona familiarizada
con ambos procedimientos aplicara el término *misdemeanor*
a cualquier delito comprendido en el antiguo Código Penal, y
cualquiera alusión o comparación que quisiera hacerse ori-
ginaría confusión.

De acuerdo con el antiguo procedimiento, el tribunal sen-
tenciador (*) tenía que redactar una sentencia en estricta con-
formidad con la Ley de Enjuiciamiento Criminal. En esa
sentencia tenía que hacerse una relación *correcta* de todos los
hechos probados, según surgieran de la prueba practicada
durante el juicio. El tribunal tenía que expresar también

sus conclusiones legales y terminar expresando el castigo que impusiera. *Estos tres elementos componentes se exigían de modo imperioso.* Esta relación de hechos, según aparecía en las sentencias como *hechos probados,* era todo lo que el tribunal de apelación podía tomar en consideración al revisar la causa, de acuerdo con el procedimiento criminal vigente con anterioridad al primero de julio de 1902. Por consiguiente, es muy marcada y notable la diferencia que existe entre la antigua y la nueva ley. Con arreglo al nuevo procedimiento, en casos de *felony* aparece toda la prueba o aquella parte de la misma que el apelante considere necesario expresar por medio de un pliego de excepciones. Con arreglo al otro procedimiento, o sea la ley española, aparece una relación de los hechos tomada de la prueba practicada durante el juicio y expresada en la sentencia de la corte de distrito, y aunque este tribunal había resuelto que todos los delitos cometidos con infracción del antiguo Código Penal español y con anterioridad al primero de julio de 1902, tenían que ser juzgados y castigados con arreglo al antiguo procedimiento, no obstante, la *corte de distrito,* según aparece claramente de sus propios autos, resolvió, en el *segundo juicio* de esta causa, que el nuevo Código de Enjuiciamiento Criminal era de aplicarse, considerando el delito hasta como un *misdemeanor,* cuando esta nomenclatura legal era absolutamente desconocida en el procedimiento español, adoptando así un procedimiento que no estaba justificado por autoridad o fundamento alguno. Este hecho parece concluyente, según se deduce de la providencia que obra en autos distada por la corte de distrito en primero de octubre de 1903:

"*Resultando:* qué el Tribunal Supremo anuló la sentencia decretada (*) en esta causa y todo lo actuado desde la acusación fiscal y ordenó que se celebrara nuevo juicio con arreglo a ley.

"*Resultando:* que hoy está vigente, desde el 1º. de julio de 1902, y después de la instrucción de esta causa, una nueva ley procesal.

"Cítese al acusado Hobart S. Bird para que comparezca ante el

tribunal el día 12 del corriente a las 9 de la mañana y oiga la acusación fiscal (antes conclusiones provisionales) y conteste dicha acusación con arreglo al Código de Enjuiciamiento Criminal vigente y para señalar día para el juicio.''

De acuerdo con esta resolución de la corte de distrito, el acusado, después de dictada la sentencia condenatoria, fué prontamente conducido a la cárcel, no siéndole concedidos los diez días de gracia y privilegio para interponer la apelación de acuerdo con el antiguo procedimiento.

Tarde en la noche de su prisión, se presentó al Juez Sr. Hernández, uno de los magistrados de esta corte, una solicitud de *habeas corpus*, y dicho magistrado dictó una providencia transfiriendo la solicitud al conocimiento del tribunal en pleno en la mañana siguiente. . Al resolver la solicitud de *habeas corpus,* este tribunal, entre otros, expresó el siguiente:

''*Considerando:* que debiendo haberse continuado sustanciándose esta causa con arreglo al procedimiento antiguo, por tratarse de la averiguación y castigo de un delito cometido con anterioridad a la fecha en que comenzó a regir en esta Isla el nuevo Código Penal, según está ya declarado por esta Corte Suprema en otros casos análogos, no ha podido ser reducido a prisión el peticionario para cumplir una sentencia que no era firme, puesto que aun no habían transcurrido los 10 días que le concedía el artículo 81 de la Orden General, número 118, para alzarse contra la sentencia, requisito indispensable para que ésta hubiera adquirido la calidad de firme, y hubiera podido procederse a su ejecución con arreglo al artículo 988, en relación con el 141 de la antigua Ley de Enjuiciamiento Criminal.''

Lo que no puede significar otra cosa que, toda vez que el proceso fué comenzado bajo el antiguo Código Penal, y siendo (*) por un delito cometido con anterioridad al primero de julio de 1902, tenía que ser continuado y terminado de la misma manera. Esto no lo hizo el tribunal sentenciador, negándole por ello hasta el derecho de apelación, considerando el delito como si fuera un *misdemeanor*. Convencido el Tri-

bunal Supremo del error cometido por la corte de distrito al resolver el caso en esa forma, concedió el auto y puso en libertad al prisionero.

Posteriormente el acusado siguió su apelación contra la sentencia de la corte de distrito para ante este tribunal, y el veinte y siete de febrero de 1904, fué confirmada la sentencia dictada por la corte de distrito.

La causa fué devuelta a la corte de distrito y el acusado Bird fué arrestado nuevamente y conducido a la cárcel, obteniendo entonces el presente auto de *habeas corpus*. No puedo estar conforme con mis compañeros al denegar la petición, porque opino que todos los procedimientos seguidos con motivo de esta acusación criminal desde el principio, son absolutamente nulos, y que muchos otros errores se cometieron que afectaron el derecho civil a la libertad personal, y los cuales pueden revisarse propiamente en un procedimiento de *habeas corpus*.

En el segundo juicio celebrado en este caso, volvió a formar parte del tribunal un juez especial, juntamente con los jueces nombrados regularmente. En la apelación interpuesta con motivo del primer juicio, expresé mi opinión sobre este punto, en la siguiente forma:

"La corte de distrito trae su origen del artículo 10 de la Orden General, número 118, que dice así:

" 'Cada tribunal de distrito se compondrá de tres jueces, entre los cuales uno será presidente, y los cuales reunidos todos, constituirán su sala de justicia, para lo civil y criminal * * *.'

La facultad de nombrar jueces suplentes se deriva del artículo 94 de la misma orden, que dice así:

" 'Los tribunales nombrarán uno o más jueces suplentes para que (*) sustituyan a los propietarios en los casos de vacantes o ausencias o enfermedades. Cada Fiscal nombrará también su suplente para iguales casos.

" 'El nombramiento habrá de racear en letrados inscritos en el Colegio de esta Isla, con residencia fija y estudio abierto en la capitalidad donde el tribunal ejerciere sus funciones. Los jueces suplen-

tes devengarán en concepto de dietas, 6 pesos, oro americano, por cada día en el que ejercieren funciones de justicia en cortes de distrito y 10 pesos, oro americano, si las ejerciesen en el Tribunal Supremo.'

Por virtud de la Sección 33 de la Ley del Congreso titulada: ''Ley para proveer temporalmente, de rentas de un gobierno civil a la Isla de Puerto Rico, y para otros fines,'' aprobada en abril 12, 1900, se dejaron subsistentes las cortes de distrito. Dicha sección está expresada en los siguientes términos:

'' 'Que el poder judicial residirá en las cortes y tribunales de Puerto Rico establecidos ya y en ejercicio * * *. Por la presente se declaran subsistentes dichas cortes y tribunales * * *. *Disponiéndose, sin embargo,* * * * los jueces de las cortes de distrito serán nombrados por el Gobernador, con el concurso y consentimiento del Consejo Ejecutivo * * *.'

Aparece, pues, que dicha Ley del Congreso especialmente dispuso que para ser nombrado juez de una corte de distrito de Puerto Rico, dos condiciones absolutas y positivas deben existir, a saber, que tales jueces deben ser nombrados por el Gobernador y con el concurso y consentimiento del Consejo Ejecutivo, lo que tácitamente implica, pero expresa de modo efectivo, que solamente aquellos que posean estas condiciones, y no otros, han de ser los jueces de las cortes de distrito de Puerto Rico investidos con la jurisdicción que corresponda a dichos tribunales.

Mas si fuere de otro modo, y si dicha Ley del Congreso no impidiera el nombramiento de jueces suplentes, aun en ese caso sostengo que dicho artículo 94 de la Orden General es nulo, porque dice: ''Los tribunales nombrarán uno o más jueces suplentes,'' etc. Esto indicaría que un tribunal podría nombrar tantos como tres, constituyendo de ese modo un tribunal completamente nuevo.

Pero aun admitiendo que los jueces suplentes pudieran ser nombrados, se observará que dicho artículo dice: ''El *tribunal*

nombrará jueces suplentes." De donde se deduce que si existe alguna facultad de nombrar jueces suplentes, tales nombramientos deben hacerse por el tribunal, constituído por tres jueces.(*)

La Sección 33 de la Ley Orgánica dice así:

"Sección 33. Que el poder judicial residirá en las cortes y tribunales de Puerto Rico establecidos ya y en ejercicio, incluyendo los juzgados municipales, creados en virtud de Ordenes Generales, número 118, promulgadas por el Brigadier General Davis, Voluntarios de los Estados Unidos, en agosto 16 de 1899, incluyendo también los tribunales de policía establecidos por Ordenes Generales, número 195, promulgadas en noviembre 29 de 1899 por el Brigadier General Davis, Voluntarios de los Estados Unidos, y las leyes y ordenanzas de Puerto Rico y sus municipios que se hallan vigentes, en todo lo que no se oponga a esta ley, y por la presente se declaran subsistentes dichas cortes y tribunales. La jurisdicción de estas cortes y trámites seguidos en ellas, así como los distintos funcionarios y empleados de las mismas, respectivamente, serán los que se definen y prescriben en dichas leyes y ordenanzas y dichas Ordenes Generales, número 118 y 195, mientras no se legisle otra cosa. *Disponiéndose, sin embargo,* que el Presidente y jueces Asociados del Tribunal Supremo y el márshal (Alguacil Mayor) del mismo, serán nombrados por el Presidente, con el concurso y consentimiento del Senado; y los jueces de las cortes de distrito serán nombrados por el Gobernador con el concurso y consentimiento del Consejo Ejecutivo, y todos los demás empleados y agregados de las demás cortes serán escogidos o elegidos según disponga la Asamblea Legislativa, la que tendrá autoridad para legislar de tiempo en tiempo, conforme tenga por conveniente, con referencia a dichas cortes, y cualesquiera otras que estime oportuno establecer: su organización, el número de jueces y empleados y agregados para cada una, su jurisdicción, sus procedimientos y demás asuntos que las afecten."

Aunque la Ley del Congreso expresa "que el poder judicial residirá en las cortes y tribunales establecidos ya y en ejercicio * * * por la presente se declaran subsistentes dichas cortes y tribunales," no obstante, tales cortes y tribunales han sido creados por el Congreso de la misma manera

que si la ley estuviera redactada así: "Habrá un Tribunal
Supremo, una corte de distrito," etc. La intención del Con-
greso debe haber sido la de *crear* tribunales para (*) Puerto
Rico, lo que puede deducirse fácilmente del mismo título de
la·ley "Ley para proveer temporalmente, de rentas y un
Gobierno Civil." El requisito más importante de un Go-
bierno Civil son los tribunales de justicia. Si el Congreso
estimó que los tribunales establecidos ya por el Gobierno Mili-
tar eran tribunales adecuados, no podía emplear ninguna
expresión más propia que el mismo término "subsistente."
Parece, por consiguiente, que estas cortes, el Tribunal Su-
premo y las cortes.de distrito, no pueden ser afectadas en su
constitución por ninguna Ley de la Asamblea Legislativa de
Puerto Rico. Son tribunales constitucionales en tanto en
cuanto la ley de abril 12 de 1900 (Ley Foraker) sea la consti-
tución de Puerto Rico; y si han de hacerse algunos cambios,
bien por el nombramiento de jueces suplentes o especiales, el
Congreso, el creador de estas organizaciones, es el único que
puede legislar sobre esta materia y disponer la manera de su
nombramiento. El Gobernador, con el concurso y consenti-
miento del Consejo Ejecutivo, puede nombrar un nuevo juez
para cubrir una vacante, pero no puede nombrar a un juez
suplente o especial.

Se observará también que dicha sección 33 prescribe que
la Legislatura "tendrá facultad para legislar de tiempo en
tiempo con referencia a dichas cortes, y *cualesquiera otras
que estime oportuno establecer, su organización, el número de
dichos jueces, su jurisdicción,*" etc.

Las primeras palabras "tendrá autoridad para legislar
con referencia a dichas cortes" solamente pueden referirse a
las· cortes establecidas, o que se dejaran subsistentes por
dicha Ley del Congreso. Esto lo ha cumplido la Legislatura
de tiempo en tiempo al aprobar, por ejemplo, una ley de *man-
damus,* y otras, cambiando el procedimiento, y otras seme-
jantes, pero la *última parte de la ley* que se refiere al número

de jueces y su jurisdicción, solamente puede tener aplicación a los nuevos tribunales que hayan de establecerse por la Legislatura, por virtud de esta facultad que le ha sido (*) conferida por el Congreso. La jurisdicción del Tribunal Supremo y cortes de distrito ha sido definida al principio de dicha sección, cuando dice "que serán los que se definen y prescriben en dichas leyes y ordenanzas y órdenes militares." La Legislatura puede aumentar y extender la jurisdicción de dichos tribunales constitucionales, con tal que tales innovaciones y extensiones estén dentro de la esfera de la organización que se ha intentado darles.

El juez suplente o especial que formó tribunal en esta causa no fué nombrado por el tribunal, sino por orden del Attorney General, indudablemente de acuerdo con las líneas siguientes que se encuentran en el presupuesto anual, o ley de presupuesto de la Legislatura Insular, aprobada en 12 de marzo de 1903:

"Para un juez asociado suplente, con residencia fija en San Juan, quien en el desempeño de su cargo se sujetará a las órdenes del Attorney General, para cubrir temporalmente las vacantes que ocurran en las cortes de distrito de la Isla, $1,500."

Esta parte solamente no podría tener el efecto de derogar la Orden General referente a jueces suplentes, en caso de que la misma estuviera aun en vigor. La corte de distrito, dudosa, quizás, con respecto a si era correcto que un juez suplente pudiera o nó ser nombrado para formar tribunal en esta causa, pidió al Attorney General su opinión sobre el asunto, lo que puede deducirse de la siguiente carta que se encuentra en autos:

"Oficina del Attorney General de Puerto Rico, San Juan, julio 27, 1903. Hon. Frank H. Richmond, juez presidente accidental, Corte de Distrito de San Juan. Señor: En contestación a su atenta del 3 del corriente, me permito manifestar que he sido informado de que el Hon. Angel García Veve tiene un nombramiento de juez

suplente, expedido por el Gobernador, siendo el deber de aquél servir en casos de esta naturaleza y que por tal servicio se le paga un sueldo anual. Si he sido correctamente informado, me parece, pues, que es él (*) la persona que debe actuar en el asunto. Si esto es un error, sírvase informarme en qué consiste tal error. Muy sinceramente suyo, Willis Sweet, Attorney General.''

Se observará, pues, que el Hon. Angel García Veve había sido nombrado solamente por el Gobernador y no fué confirmado por el Consejo Ejecutivo. Si hubiera sido de otro modo, el Hon Attorney General, que es miembro del Consejo Ejecutivo, lo hubiera dejado ver en su comunicación al tribunal, y que él debe haber tenido alguna duda con respecto a la legalidad de un juez que no ha sido debidamente nombrado con arreglo a ley, puede deducirse de su misma comunicación.

La comunicación de la corte de distrito al Attorney General no se encuentra en autos, y por esta razón no aparece de modo afirmativo que existiera alguna vacante en dicha corte, pero hay una correspondencia entre el Attorney General y la corte de distrito, en relación con el primer juicio, de la que aparece que dos jueces de la corte de distrito se consideraron incompetentes para actuar en la causa. Puede, por lo tanto, deducirse racionalmente que las mismas condiciones existían en el segundo juicio con respecto a uno de los jueces, que no había vacante alguna, y en ese caso las líneas de carácter legislativo, contenidas en la ley de presupuesto, no tenían aplicación alguna.

La doctrina americana que hace referencia a jueces *de facto* no puede aplicarse propiamente a un tribunal español, que entienda en materia criminal, cual lo fué el que juzgó y condenó al acusado, y debe tenerse presente que estas leyes continuaron subsistentes por virtud de la sección 8 de la Ley Foraker. Dice así:

''Sección 8. Que las leyes y ordenanzas de Puerto Rico actualmente en vigor, continuarán vigentes, excepto en los casos en que sean

alteradas, enmendadas o modificadas por la presente; o hayan sido alteradas o modificadas por órdenes militares y decretos vigentes cuando esta ley entre a regir, y en todo aquello en que las mismas (\*) no resulten incompatibles o en conflicto con las leyes estatutarias de los Estados Unidos, no inaplicables localmente, o con las presentes disposiciones, hasta que sean alteradas, enmendadas o revocadas por la autoridad legislativa creada por la presente para Puerto Rico, o por una Ley del Congreso de los Estados Unidos.''

Bajo el Gobierno español, los jueces suplentes eran nombrados por el Capitán General de la Isla, mas esta práctica fué cambiada por la Orden General, y ellos tenían que ser nombrados por el tribunal (*supra*).

La corte de distrito en tales casos criminales constituye tribunal como si fuera un jurado, y por esta razón debe existir una ley válida y expresa que autorice el nombramiento de jueces suplentes o especiales, porque si no fuera así casi aparecería que tales funcionarios se convertirían en jurados *de facto*.

El Tribunal Supremo de los Estados Unidos, en el caso de *Ex parte Henry Ward,* vol. 173, página 452, dice:

''No necesitamos, sin embargo, tomar en consideración la brillante y completa argumentación del abogado con respecto a este punto, toda vez que estimamos que es aplicable a este caso la regla bien establecida de que cuando un tribunal tiene jurisdicción sobre el delito y sobre el acusado, y los procedimientos son correctos en otros sentidos, una declaración de culpabilidad es legal, aun cuando el juez que constituya tribunal sea solamente un funcionario *de facto;* y que la validez del título de tal juez para desempeñar el cargo, o su derecho para ejercer funciones judiciales no pueden resolverse en un procedimiento de *habeas corpus.*''

El tribunal establece sus conclusiones fijando como requisito que los procedimientos *sean correctos en otro sentido,* pero se observará que los procedimientos seguidos en el caso sometido a nuestra consideración fueron de lo más irregular que puede darse y aun desde su mismo principio la ley de abril

12 de 1900, conocida como Ley Foraker, en su sección 16, exige que todas las diligencias judiciales se harán a nombre (*) de los "Estados Unidos de América, ss: El Presidente de los Estados Unidos de América." La orden, el mandamiento, es de lo más esencial en un procedimiento criminal. En este caso no se ha expedido tal mandamiento.

La doctrina referente a jueces *de facto* ha sido frecuentemente resuelta en los Estados Unidos en favor de tales funcionarios, pero debe tenerse presente que en este caso se trata de aplicar una jurisprudencia completamente americana a un procedimiento y sistema de leyes enteramente extraño para la primera, y en que la designación de un juez *de facto* es absolutamente desconocida. La aplicación resulta por consiguiente forzada y violenta. Debemos administrar la ley en la forma en que la encontremos.

El Decreto Real que exige que un acusado sea notificado por lo menos veinte y cuatro horas del hecho de que un juez suplente habrá de constituir tribunal en el juicio de su causa, no había tampoco sido derogado, y el antiguo procedimiento, con respecto a delitos cometidos con anterioridad al primero de julio de 1902, estaba también vigente en la época en que se celebró el segundo juicio, como lo estaba asimismo al celebrarse el primero, según resolvió este tribunal en los procedimientos sobre *habeas corpus*. De los autos no aparece que tal notificación se hiciera alguna vez. Esta omisión debe haberse escapado a los jueces del Tribunal Supremo en la vista de la apelación a que dió lugar el segundo juicio.

Es, por lo tanto, evidente que la corte de distrito incurrió en error y que el caso debió haberse revocado por las mismas razones que motivaron la revocación del primer juicio.

Podría argumentarse que no se hizo objeción alguna por parte del acusado, pero dichos tres jueces, en esta decisión de 15 de junio de 1903, al revocar la primera sentencia y ordenar la celebración de un nuevo juicio, resolvieron que, toda vez que la Asamblea Legislativa de Puerto Rico, en 12 de marzo

de 1903, cambió la naturaleza del Tribunal Supremo, de casación, a un tribunal de apelación, ''este tribunal, (*) para realizar los más altos fines de la justicia, está en el deber de fijar su atención en el procedimiento y decidir sobre los errores substanciales que en él se hayan cometido, aunque sobre ellos nada se haya alegado por las partes.'' Estos mismos fines de la justicia debieron también haberse aplicado en la segunda apelación. En la primera apelación, el tribunal, de oficio, suplió la omisión en que incurriera el acusado.

Es evidente que el acusado fué juzgado de acuerdo con el nuevo Código de Enjuiciamiento Criminal, y surge la cuestión de si el tribunal, al juzgar y declarar culpable al acusado Bird, bajo ese procedimiento, en lugar de haberse ajustado al antiguo Código español, incurrió en errores que resultaron en perjuicio de aquél.

Las leyes que regulan los juicios y las sentencias de las cortes de distrito, bajo el antiguo sistema, son de carácter mandatorio e imperativo, y se exigía su más estricto cumplimiento. El artículo 142 de la Ley de Enjuiciamiento Criminal, dice así:

''Las sentencias se redactarán con sujeción a las reglas siguientes:

''1. Se principiará expresando: El lugar y la fecha en que se dictaren, los hechos que hubieren dado lugar a la formación de la causa, los nombres y apellidos de los actores particulares si los hubiere, y de los procesados, los sobrenombres y apodos con que sean conocidos, su edad, estado, naturaleza, domicilio, oficio o profesión, y en su defecto, todas las demás circunstancias con que hubieren figurado en la causa, y, además, el nombre y apellido del magistrado ponente.

''2. Se consignarán en *resultandos* numerados los hechos que estuvieren enlazados con las cuestiones que hayan de resolverse en el fallo, haciendo declaración expresa y terminante de los que se estimen probados.

''3. Se consignarán las conclusiones definitivas de la acusación y de la defensa y la que en su caso hubiese propuesto el tribunal, en virtud de lo dispuesto en el artículo 733.

"4. Se consignarán también en párrafos numerados, que empezarán con la palabra *considerando:* (*)

"*Primero.* Los fundamentos doctrinales y legales de la calificación de los hechos que se hubiesen estimado probados.

"*Segundo.* Los fundamentos doctrinales y legales determinantes de la participación que en los referidos hechos hubiese tenido cada uno de los procesados.

"*Tercero.* Los fundamentos doctrinales y legales de la calificación de las circunstancias atenuantes, agravantes o eximentes de responsabilidad criminal, en caso de haber concurrido.

"*Cuarto.* Los fundamentos doctrinales y legales de la calificación de los hechos que se hubiesen estimado probados, con relación a la responsabilidad civil en que hubiesen incurrido los precesados, o las personas sujetas a ella a quienes se hubiere oído en la causa, y los correspondientes a las resoluciones que hubieren de dictarse sobre costas, y en su caso, a la declaración de querella calumniosa."

Los *resultandos* (conclusiones de hecho) deben contener "los hechos que se relacionen con la cuestión." No acepto como correcta la traducción del segundo párrafo. Estas traducciones se hicieron en el Departamento de la Guerra de Washington, y nunca se han considerado en Puerto Rico como traducciones oficiales, sino simplemente como una cuestión de conveniencia. La palabra "*related*" se encuentra en el original español como "enlazado," que en este caso significa, entrelazados o conectados. La prueba principal y esencial de este caso fué el artículo publicado. Este, de acuerdo con el antiguo procedimiento, no podía consignarse *aliunde* en otras partes del récord; tenía que expresarse en toda su extensión en los *resultandos* (conclusiones de hecho), como hechos probados, como este tribunal ha resuelto ya invariablemente, y esto lo hizo la corte de distrito en el primer juicio. Sin embargo, este tribunal ha resuelto también que de acuerdo con la jurisprudencia del Tribunal Supremo de España, cuando las conclusiones de hecho no eran completas y no expresaban suficientemente el delito, y podía éste deducirse de las conclusiones legales, cuando en ella se expresaban los hechos de-

ficientes, el tribunal podía considerar las últimas en relación con las primeras, pero que todos los hechos tenían que aparecer de la sentencia.(*)

En este caso la corte de distrito no redactó sentencia alguna, según lo exige de modo imperativo el procedimiento español, de acuerdo con el cual fué Bird acusado, juzgado y condenado. No ha habido ni *resultandos* (conclusiones de hechos) ni *considerandos* (conclusiones legales), sino que en lugar de esto, se dictó la sentencia de 21 de octubre de 1903, que es todo lo que este tribunal podía considerar al resolver la apelación.

En un caso, ante este tribunal, seguido contra Mariano Abril Ostaló, director de un periódico titulado *La Democracia*, la relación de hechos contenida en la sentencia de la corte de distrito decía solamente lo siguiente:

"*Resultando:* que el periódico *La Democracia* del día 7 del mes, en su segunda hoja contiene un artículo titulado 'Tribunal de Policía' en el que se insertan frases y expresiones injuriosas al alcalde municipal de esta ciudad en sus funciones de juez de policía."

El Tribunal Supremo no estimó suficiente esta relación de los hechos y en una sentencia o resolución, revocando el caso, dice:

"*Considerando:* que el artículo 142 de la Ley de Enjuiciamiento Criminal prescribe que los hechos que se consideren probados y que estén enlazados con la cuestión y hayan de tomarse en relación con la culpabilidad deben expresarse en resultandos numerados.

"*Considerando:* que en los resultandos de la sentencia apelada, y que se han insertado anteriormente, no se ha insertado ninguna palabra, frase, o porción del artículo publicado en el periódico *La Democracia*, con el título 'Tribunal de Policía,' que constituya el delito de injuria contra la autoridad, que así se ha calificado y castigado; y que tal sentencia no contiene suficientes hechos que sirvan de base para afirmar que el procesado reuna los requisitos integrantes de aquel delito, procediendo así, en su consecuencia, por tal concepto, la casación que se ha solicitado."

La Corte de Distrito de Ponce, en donde se celebró el (*) juicio, no se ajustó a los preceptos estrictos de la ley, como se consigna en el artículo 142. Las conclusiones de hecho (resultandos), no contenían el artículo publicado. Por lo tanto el Tribunal Supremo revocó la sentencia de la corte de distrito y absolvió al acusado, facultad que tenía el tribunal de acuerdo con el antiguo procedimiento criminal.

Se ha indicado que la ley de 12 de abril de 1903, convirtiendo esta corte de tribunal de casación en tribunal de apelación, relevándole por ello de las estrictas reglas y limitaciones, y concediéndole el privilegio de una interpretación más liberal, autorizaría a este tribunal para suplir cualquier defecto del tribunal inferior en una causa criminal, al efecto de declarar culpable un acusado. No estoy de acuerdo con esa afirmación. Una ley subsiguiente puede mejorar las condiciones de un acusado en una causa criminal, pero que el privilegio de una interpretación liberal, concedido a un tribunal de apelación, pueda ser utilizado a los efectos de dar una declaración de culpabilidad, es una afirmación tan extravagante que los términos *ex-post facto* o "retroactivo" serían inadecuados para describirla. De acuerdo con el procedimiento español y con las reglas generales de Derecho Penal, en tales casos debe someterse a la consideración del tribunal el artículo publicado en su totalidad, para darle al acusado el beneficio de cualquiera expresión consignada en el mismo, que pueda tender a mitigar o explicar su sentido.

Los *resultandos* (conclusiones de hecho) de la sentencia, que contienen los hechos probados, toman el lugar de la prueba consignada en un pliego de excepciones, de acuerdo con el procedimiento penal americano. ¿Podría un tribunal de apelación en los Estados Unidos, revocar una sentencia en los casos en que el apelante dejara de incluir en su pliego de excepciones el artículo injurioso que trajo consigo la declaración de su culpabilidad, impidiendo por ello que el tribunal tuviera oportunidad de apreciarlo? Haciendo aplicación de

este principio, en sentido inverso, pero natural, ¿cómo (*) puede un tribunal de apelación, bajo el procedimiento español, confirmar una sentencia en los casos en que el tribunal sentenciador, cuyo sagrado deber era incluir el artículo injurioso en los resultandos de su sentencia, ha dejado de hacerlo así, con infracción de las estrictas reglas de derecho, y cuando está fuera de las facultades del apelante regular la acción del tribunal, privándole por ello de los beneficios de hacer que su causa se revisara por el más alto tribunal?

Toda vez que la corte de distrito hizo aplicación del nuevo Código de Enjuiciamiento Criminal, juzgando el caso como un *misdemeanor,* del cual no había apelación, hubiera sido superfluo e inútil que el acusado preparara un pliego de excepciones e incluyera en él, íntegro, el artículo publicado, a fin de someterlo a la consideración de este tribunal para su revisión. Esta resolución y acción por parte de la corte de distrito resultó, por consiguiente, en detrimento del acusado, y ha debido revocarse la sentencia dictada por la corte de distrito. La opinión emitida por esta corte en febrero 27 de 1904, en donde se confirma la sentencia de la corte de distrito, contiene íntegramente el artículo o publicación, tomándolo, indudablemente, de los documentos en autos, pero esta amplificación que ha hecho este tribunal no puede ni suplir las omisiones en que incurriera la corte de distrito, ni corregir los errores por ella cometidos.

El artículo 265 del antiguo Código Penal español, ley bajo la cual el acusado Bird fué acusado y declarado culpable, dice así:

"Los que, hallándose un Ministro de la Corona o una autoridad en el ejercicio de sus funciones o con ocasión de éstas, los calumniaren, injuriaren, insultaren de hecho o de palabra, fuera de su presencia o en escrito que no estuviere a ellos dirigido, serán castigados con la pena de *arresto mayor.*"

Parece evidente que esta ley solamente puede tener referencia a Ministros de la Corona, bajo el Gobierno español, o (*) a funcionarios de la monarquía, y que no puede tener aplicación alguna a un juez o institución que traiga su existencia de una ley del Congreso de los Estados Unidos, o de cualquiera otra autoridad americana. Las leyes que al adquirir un territorio extranjero, se encuentren vigentes en él y que estén en conflicto o sean incompatibles con nuestras instituciones, constitución y jurisprudencia americana, deben caer sin ningún acto legislativo especial a ese efecto, y puedo, por lo tanto, sostener con seguridad, que cuando después del Tratado de Paz entre el Gobierno de lo Estados Unidos y el Reino de España, los "Ministros de la Corona y las autoridades en el ejercicio de sus funciones" se marcharon de la Isla de Puerto Rico, y regresaron a su madre patria, se llevaron consigo el alma y el espíritu de este mismo artículo 265 del Código Penal, arrojándolo a los pies de su hacedor en España, y quedando sólo en Puerto Rico, su cuerpo, sin vida alguna, a manera de letra muerta en los libros estatutarios, y las cortes y tribunales de la Isla de Puerto Rico no están investidos de la facultad judicial sobrenatural de resucitar este cadáver, para darle animación y vitalidad, y para ajustarlo y amoldarlo, como un entrepaño, en la estructura del Derecho Penal bajo una forma de Gobierno republicano. Y el prisionero Bird fué acusado, juzgado, y condenado de acuerdo con esta ley que no tiene vida alguna.

Pero esta ley debe ser considerada también bajo otro aspecto. No es ni una ley de desacato a tribunales, ni tiene el carácter de una ley general sobre libelo. Prohibe e impide publicaciones contra determinadas personas solamente. Este tribunal ha resuelto que la primera enmienda a la Constitución de los Estados Unidos, que se refiere a la libertad de la prensa y la palabra, está vigente en Puerto Rico, y esa resolución se fundó en lo resuelto por el Tribunal Supremo de los Estados Unidos en el caso de *Chicago, Rock Island,* etc., *R. R.*

*Co.* v. *McGlinn,* 114 U. S., 546, en donde, por conducto del Juez Asociado, Sr. Field, el tribunal se expresa así: (*)

"Es una regla general de derecho público, reconocida y aceptada por los Estados Unidos, que siempre que la jurisdicción política y el poder legislativo que existan sobre cualquier territorio se transfieran de una nación o soberanía a otra, las leyes municipales del país—esto es, las leyes que tienen por objeto la protección de los derechos privados—continúan vigentes hasta que sean derogadas o modificadas por el nuevo Gobierno o Soberanía. Por virtud de la cesión, los bienes públicos pasan de un gobierno a otro, pero la propiedad privada permanece como antes, y con ella, aquellas leyes municipales que tienen por objeto asegurar el uso y goce pacífico de la misma. Como una consecuencia necesaria todas las leyes, ordenanzas y disposiciones que estén en conflicto con la naturaleza política, instituciones y constitución del nuevo gobierno quedan inmediatamente anuladas. Así, por virtud de la cesión de una jurisdicción política y del poder legislativo—y el último está envuelto en la primera—a los Estados Unidos, las leyes que existan en el país y que tiendan a sostener una religión ya establecida, o que tiendan a limitar la libertad de la prensa, o que autoricen castigos inusitados y crueles y otras semejantes, inmediatamente cesarían de ser obligatorias sin necesidad de que se haga declaración alguna a ese efecto; y las leyes del país sobre otras materias serían necesariamente suplantadas por las leyes existentes en el nuevo gobierno, que se refieran a las mismas materias. Mas con respecto a otras leyes que afecten la posesión, uso y traspaso de bienes, y que tengan por objeto asegurar el buen orden y la paz en la comunidad, y obtener la salud y prosperidad de la misma, que son estrictamente de carácter municipal, es regla general de que un cambio de soberanía las deja en vigor hasta que, por acción expresa del nuevo gobierno, sean alteradas o derogadas."

Parece, por consiguiente, que la ley antes mencionada infringe los preceptos de esta enmienda porque, aparentemente, supone ilegal la publicación misma, coartando por ello la libertad de la prensa. Encontramos en la obra de Story sobre la Constitución, tomo 2, página 643, lo siguiente:

"Una persona es responsable por el *abuso del derecho de la libertad de la prensa,* pero cualquier ley que prohiba la publicación misma infringe ciertamente la Constitución." (*)

En la solicitud interesando el auto de *habeas corpus* se alega también que debió concederse al prisionero un juicio por jurado. La cuestión de si la Constitución está o nó vigente en Puerto Rico, no surge necesariamente en relación con la alegación del solicitante; pero encontramos ciertas expresiones del Tribunal Supremo de los Estados Unidos, en el caso de *Downes* v. *Bidwell,* que pudieran tomarse en consideración, en este asunto. En una opinión disidente que emití en este tribunal, en el caso de *Ex parte Soldini,* tuve ocasión de hacer referencia a esa misma resolución. Sin entrar en detalle alguno con respecto a este litigio, expresaré brevemente que Stahl estableció un pleito bajo el antiguo Código Penal, de la naturaleza de libelo, contra Soldini. El acusado fué absuelto por la Corte de Distrito, y el demandante, acusador privado, apeló para ante este tribunal. La mayoría del tribunal, compuesta de los Honorables Juez Presidente Sr. Quiñones y Jueces Asociados Sres. José C. Hernández y José Ma. Figueras, revocaron la sentencia de la corte inferior y simplemente, por los resultandos contenidos en la sentencia de la corte de distrito, declararon convicto al acusado y le impusieron determinado castigo. Disentí de esa opinión en los siguientes términos:

"Se afirma que la Sección 8 de la ya mencionada Ley del Congreso restableció las leyes y decretos de España, en vigor en aquella fecha, declarándolas vigentes en Puerto Rico, sujetas, sin embargo, a ciertas modificaciones que en dicha ley se expresan. Pero cualquiera que sea la extensión de esta ley, nunca podría tener el efecto de dejar en vigor en Puerto Rico leyes que están en absoluta oposición con nuestras instituciones, que infringen principios generales y universales del sistema americano, que afectan derechos personales, así como el derecho a la vida, a la libertad y a la propiedad, despojando de ese modo a una persona de privilegios sagrados, garantizados por

la Constitución, y a los que tienen derecho todas las personas que vivan bajo la protección de este Gobierno, que consideren a los Estados Unidos de América como a su propio país, o que residan dentro de los límites de esta república. En esta opinión parece que (*) nos sostiene la Corte Suprema de los Estados Unidos, según sus propias expresiones en el caso de *Downes* v. *Bidwell*, 182 U. S., 282.

"Sugerimos, aunque sin intención de resolver nada, que puede haber alguna diferencia entre ciertos derechos naturales, establecidos en la Constitución mediante prohibiciones contra toda intervención con ellos, y lo que podríamos llamar derechos artificiales o reparadores (*remedial*) que son propios de nuestro sistema de jurisprudencia. A la primera clase pertenecen los derechos que tiene uno de sustentar opiniones religiosas particulares, y de expresarlas públicamente, o, como se dice algunas veces, adorar a Dios según los dictados de nuestra propia conciencia; el derecho a la libertad personal y a la propiedad individual; el derecho a la libertad de la palabra y de la prensa; a la libre admisión en las cortes de justicia; el derecho a que los procedimientos legales sigan su curso natural y a que las leyes se apliquen igualmente a todos; el derecho a privilegios o inmunidades contra registros o investigaciones y embargos o capturas, que no sean razonables, así como también contra castigos crueles y no comunes; y a todos los otros privilegios que son indispensables a un Gobierno libre.

"Aun cuando las expresiones de la Corte Suprema, contenidas en la cita anterior, no sean completamente definidas, sin embargo, la corte declara más adelante, en los términos más precisos, el grado de protección que ha de darse al Pueblo de Puerto Rico con arreglo a la Constitución.

"Cualquiera que sea la resolución final del pueblo americano con respecto al *status* de estas islas y de sus habitantes—ya se les permita ingresar en la hermandad de Estados, o formar gobiernos independientes—no se sigue desde luego, que, en el entretanto es decir, que mientras estén esperando esa resolución, el pueblo ha de quedar con respecto a derechos personales sin la protección concedida por las prescripciones de nuestra Constitución, y sujeto simplemente al dominio arbitrario del Congreso. Aun si se les considerase como extranjeros, tienen derecho, con arreglo a los principios de la Constitución, a que se les proteja en su vida, libertad y propiedad. Esta opinión ha sido sustentada por esta corte frecuentemente con respecto a los chinos, aun los que son extranjeros, los cuales no gozan

de los derechos políticos de que gozan los ciudadanos de los Estados Unidos.

"De la anterior resolución parece que la Corte Suprema de los (*) Estados Unidos sostiene que las prescripciones de la sexta enmienda a la Constitución, en cuanto protege los derechos personales, están vigentes en Puerto Rico."

El *espíritu* de la Constitución de los Estados Unidos, este artículo de fe del pueblo americano, de carácter civil o político, y la protección a la vida y libertad que aseguran sus disposiciones, deben seguir la bandera de la nación, y permanecer siempre que el Gobierno llegue a convertirse en dueño del suelo de un país. Cuando los funcionarios enviados a las nuevas posesiones y colocados al frente de la Administración local, se obligan, en el desempeño de sus funciones, por solemne juramento, a guardar aquella Constitución, ¿consiste entonces su deber simplemente en instruir e ilustrar a los residentes con respecto a los principios y a los beneficios que la misma asegura? ¿En trazar imágenes de libertad moral y deleitar sus imaginaciones por medio de visiones que representen una protección igual con arreglo a derecho? ¿Serán suficientes estas enseñanzas y exhibiciones ilustrativas de probabilidades, sin que se llegue a una realización de las mismas? Algo más que todo eso ha debido ser la intención del Congreso de los Estados Unidos cuando por su ley de abril 12 de 1900, la Ley Foraker, estableciendo un Gobierno Civil para Puerto Rico, concede apelaciones al Tribunal Supremo de los Estados Unidos "en todos aquellos casos en que la Constitución de los Estados Unidos sea traída a discusión."

Observamos que el Tribunal Supremo de los Estados Unidos, con la sabiduría que le caracteriza se expresa así:

"Cualquiera que sea la resolución final del pueblo americano con respecto al *status* de estas islas y de sus habitantes * * * no se sigue desde luego, que, en el entretanto, es decir, que mientras estén esperando esa resolución, el pueblo ha de quedar con respecto a

derechos personales sin la protección concedida por la Constitución .
* * *. Aun cuando se les considerase (*) como extranjeros, tienen
derecho, con arreglo a los principios de la Constitución, a que se les
proteja en su vida, libertad y propiedad.''

Los principios y disposiciones de la Constitución consisten
en la protección a la vida, libertad y propiedad, y no puede
haber una protección mayor que la de un juicio por jurado.

Sin duda alguna el objeto del Congreso al establecer un
Gobierno Civil para la Isla, fué el de establecer la uniformi-
dad de las leyes y conceder iguales derechos a todos los habi-
tantes de Puerto Rico.

La sección 34 de la ley del Congreso aprobada en abril
12 de 1900, y generalmente conocida con el nombre de Ley
Foraker, dice así:

''Que Puerto Rico constituirá un distrito judicial que se denomi-
nará 'el Distrito de Puerto Rico'. El Presidente con el concurso y
consentimiento del Senado, nombrará un juez de distrito, un Fiscal
de distrito y un márshal para dicho distrito, cada uno por el término
de cuatro años, a menos que antes no sean destituídos por el Presi-
dente. La corte de distrito para dicho distrito, se denominará 'Corte
de Distrito de los Estados Unidos para Puerto Rico,' y tendrá la
facultad de nombrar todos los empleados y ayudantes necesarios,
incluyendo un *clerk* (secretario), un intérprete, y los comisionados
que sean necesarios, quienes tendrán las mismas atribuciones que los
comisionados de las cortes de circuito de los Estados Unidos; y ten-
drá, además, de la jurisdicción ordinaria de cortes de distrito de los
Estados Unidos, jurisdicción en todos los casos que sean de la com-
petencia de las cortes de circuito de los Estados Unidos, y seguirán
la misma tramitación que las cortes de circuito * * *.''

¿Podrá concebirse que una corte de distrito o de circuito
de los Estados Unidos funcionara sin juicios por jurados,
y cuán injusto aparecería que en un edificio de la ciudad de
San Juan, en la Isla de Puerto Rico, un ciudadano gozara de
todos los derechos y protección concedidos por nuestras insti-

·tuciones americanas, y en otro local de la misma capital, estos privilegios e inmunidades le sean denegados, cuando (*) todos estos tribunales han recibido su existencia de la misma fuente, o sea el Congreso de los Estados Unidos, y cuando la ley guarda silencio con respecto a los atributos Constitucionales que corresponde a cualquiera de ellos?

Debió haberse declarado con lugar la solicitud de *habeas corpus* y decretarse la excarcelación del prisionero.

OPINIÓN CONCURRENTE DEL JUEZ PRESIDENTE SR. QUIÑONES Y ASOCIADOS SRES. HERNÁNDEZ Y FIGUERAS.

Los jueces que suscriben se ven obligados a formular este voto concurrente porque las razones expuestas en el del honorable juez disidente no se expresaron por él en el momento oportuno, o sea antes de dictarse la resolución denegatoria del mandamiento de *habeas corpus* solicitado por Hobart S. Bird. Si así se hubiera hecho, se hubieran entonces discutido y apreciado en dicha resolución y así se hubiera evitado esto que tal vez parezca una incorrección.

Trata dicho juez de algunos hechos y de ciertas actuaciones que no constan de este *record* y al cual solamente podemos referirnos.

Parte el señor juez disidente de una presunción para impugnar la validez del nombramiento de Don Angel García Veve, como juez asociado de todas las cortes de distrito y que actuó como tal en el presente caso, y aunque reconoce que fué nombrado por el Hon. Gobernador, afirma que tal nombramiento no se hizo con el consentimiento del Consejo Ejecutivo; pero debemos aceptar que la primera autoridad de la Isla cumplió con ese deber, si a ello se creía obligado por las leyes, y en tanto en cuanto no se demuestre la carencia de ese requisito, hay que aceptar la legalidad del nombramiento y tener como válidos todos los procedimientos en que el juez sustituto intervino.

Se dice que al formar parte del tribunal dicho García Veve debió notificarse su nombramiento a Bird, y si esto no (*) se hizo, debió declararse nula la sentencia, como se declaró por igual motivo la dictada en 19 de septiembre de 1902. Pero debe tenerse en cuenta que son casos distintos los que se discuten por el juez disidente.

La primera designación que se hizo de un juez sustituto, fué para un caso concreto y no teniendo el acusado noticia de su designación, era necesario que se le notificara su nombramiento para que ejercitase, si lo deseaba, el derecho de recusación por las causas que taxativamente marca la ley que entonces se aplicaba. Pero en este caso el nombramiento del Juez García Veve era de carácter general, pues fué para sustituir a todos los jueces propietarios de las cortes de distrito de la Isla en los casos de vacante. Tenía, por tanto, su nombramiento un carácter público. Pero además de esto, no consta en el expediente de *habeas corpus* si el nombramiento se notificó o nó a Bird, y no es posible referirse de memoria a actuaciones que no se tuvieran en cuenta en la resolución que es hoy objeto de la apelación.

Se impugna también el procedimiento seguido por la Corte de Distrito de San Juan, pero ese procedimiento no discrepa del establecido por la Orden Judicial No. 28, de 23 de diciembre de 1899, y hay que acatar lo que dispone esa orden para los casos en que, como en el presente, pida el Fiscal pena correccional, orden que tuvo el laudable fin de activar en cuanto fuere posible los procedimientos criminales y reducir el término de las prisiones provisionales.

Se discute también la forma de la sentencia dictada por la Corte de Distrito de San Juan, porque no se acomoda a lo dispuesto en el artículo 142 de la Ley de Enjuiciamiento Criminal anterior a la que se votó por esta Asamblea Legislativa, y fué aprobada en 1°. de marzo de 1902, y de aquí se deduce que debió revocarse la sentencia condenatoria de

Bird, (*) como se hizo en el caso de la corte de Ponce, de Mariano Abril, precisamente por un defecto de forma.

Mas se olvida el señor juez disidente de los diferentes tiempos en que han ocurrido los hechos. Cuando llegó a esta corte el caso de Abril, regía en toda su plenitud la antigua ley de procedimiento que dejó aquí implantada España y era éste un tribunal que conocía de los recursos de casación, que eran remedios extraordinarios que procedían en todos los juicios criminales contra las resoluciones de los tribunales que causaban ejecutoria, con el fin de reparar el agravio que se hubiese cometido en la sentencia por infracción de ley, relativa al fondo del asunto, o por no haberse observado las formas *sustanciales* del procedimiento. Entonces no podía tenerse para nada en cuenta el sumario. Aquella corte de casación tenía que formar juicio con la misma sentencia de la corte inferior, y Mariano Abril, por consiguiente, fué absuelto, porque no se insertó en dicha sentencia el artículo que se suponía penable y faltaban, por tanto, términos hábiles para que el tribunal de casación pudiese juzgar con acierto sobre el alcance y trascendencia de las palabras publicadas en el periódico *La Democracia*. Y por eso, en este caso, y en otros semejantes y cumpliendo siempre con la ley vigente, la sentencia fué casada y absuelto el acusado del delito que se le imputaba.

Mas el caso actual de Hobart S. Bird es distinto en todos conceptos. Vino a esta corte en grado de apelación, no de casación, como el de Abril. La sentencia de Bird contiene insertas las palabras y frases que el tribunal originario conceptuó injuriosas, y ya esta corte de que formamos parte como jueces, no tiene que someterse a los estrechos moldes de la antigua ley. Hoy pudo examinar el artículo denunciado, aunque no se comprendiese lo necesario en la sentencia, como se ha comprendido, porque a ello nos autoriza la ley (*) de esta Asamblea Legislativa, aprobada en 12 de marzo de 1903, que literalmente dice así:

610–612

"LEY PARA TRANSFORMAR LA CORTE SUPREMA DE PUERTO RICO EN CORTE DE APELACIÓN.

"*Decrétase por la Asamblea Legislativa de Puerto Rico:*

"Sección 1. Que el Tribunal Supremo de Puerto Rico constituirá de aquí en adelante un tribunal de apelación y no un tribunal de casación. En sus deliberaciones y fallos en todos los asuntos, tanto en lo civil como en lo criminal, dicho tribunal no se limitará solamente a infracciones de ley o quebrantamiento de forma, según fueren señalados, alegados o salvados por los litigantes, o según se hiciera constar en sus exposiciones y excepciones, sino que con el más alto fin de justicia, el tribunal puede también entender en todos los hechos y tramitaciones en la causa, tal como aparecieren en autos, considerando en igual forma sus méritos para la mejor administración de justicia y del derecho, y evitar injusticias y demoras.

"Sección 2. Todos los artículos de la Ley de Enjuiciamiento Civil que establecen los trámites para los recursos de casación, quedan abolidos.

"Sección 3. Las apelaciones se tramitarán en la forma que establece la Ley de Enjuiciamiento para las apelaciones en los antiguos juicios de mayor cuantía, suprimiendo el trámite llamado de apuntamiento.

"Sección 4. En todos los casos en que la Ley de Enjuiciamiento Civil habla de recursos de casación, se entenderá de apelación.

"Sección 5. Toda ley o parte de ley en conflicto con las disposiciones de esta ley queda por la presente derogada.

"Sección 6. Esta Ley empezará a regir inmediatamente después de su aprobación.

"*Aprobada, 12 de marzo de 1903.*"

Y creemos que la mejor administración de justicia y del derecho y el deseo de evitar injusticias que son fines que se propone esta ley, se han de conseguir lo mismo absolviendo al inocente que condenando al que resulte culpable de un delito. (*)

Nunca consideramos tampoco, de modo tan absoluto, la necesidad de la declaratoria expresa de los hechos probados en los resultandos de la sentencia recurrida, y alguna vez se

indicó que era suficiente que de los resultandos, sin la declaratoria terminante de "probados," y de los considerandos del fallo recurrido, se dedujese de modo claro la naturaleza del delito y la participación del acusado, y esto ocurrió en el recurso de Pablo Font y Crespo, procedente de la corte de Ponce, en que no había declaratoria de hechos probados en los resultandos, y esta corte, entonces de casación, en su sentencia de 22 de noviembre de 1902, y, siendo precisamente Ponente el honorable juez disidente, consignó en un considerando que los términos absolutos y categóricos en que estaba redactado el primer resultando de la sentencia recurrida, y la relación íntima que guardaban con una consideración de la misma, eran suficientes para estimar que el tribunal *a quo* había considerado en su conciencia como probados los hechos consignados en dicho primer resultando. Esta misma teoría se sienta en la sentencia de este tribunal de 25 de marzo de 1902, que también suscribió el juez disidente.

Queda, pues, contestada la impugnación de la forma en que se redactó la sentencia de la Corte de Distrito de San Juan que condenó a Hobart S. Bird, aparte de que esa materia no es propia de un *habeas corpus,* como no es propio tampoco el procedimiento que ha seguido nuestro ilustrado compañero el señor juez disidente, al revisar la decisión de esta corte dictada en la causa pendiente de apelación, para presentar su voto particular en el asunto de *habeas corpus,* pues es jurisprudencia bien conocida que sean cuales fueren los errores de un tribunal, no pueden afectar la decisión del *habeas corpus* a no ser que llegaran a desposeer a la corte sentenciadora de su jurisdicción.

Entramos ahora en el último punto que trata el señor juez disidente y es la teoría que sostiene de que el alma y el (*) espíritu, así dice, del artículo 265 del Código Penal que se aplicó a Bird, se fué con España al cesar aquí en su soberanía. Pero ha venido a ver esto muy tarde el honorable juez disidente, porque se olvida que condenó con su voto a Práxedes

Rosario de Jesús y firmó la sentencia condenatoria de 17 de junio de 1902, aplicando el artículo 258. En otra sentencia que también votó y firmó en 26 de junio de 1902, se aplicó el artículo 262, que por su carácter, por referirse a atentado a los agentes de la autoridad y desacato a la misma, y estar en el mismo título en que está el artículo 265, debieran haberse ido con la soberanía de España, según hoy sostiene el señor juez disidente.

Pero donde se ve claramente el olvido involuntario de dicho juez, es en la sentencia de tres de junio de 1902, que copiada literalmente dice así:

"En la Ciudad de San Juan de Puerto Rico a 3 de junio de 1902, en el recurso de casación por infracción de ley que ante *nos* pende, interpuesto por Antonio Pomales Gómez, contra sentencia del Tribunal de Distrito de Arecibo, en causa seguida al mismo por injuria y calumnia a la autoridad.

"*Resultando:* que la expresada sentencia dictada en 24 de agosto último, contiene el siguiente resultando:

"*Resultando:* probado que el acusado Antonio Pomales, vecino de Manatí, dijo públicamente a varias personas, y entre ellas a Don Virgilio Pozo y Don José Rivera, que el alcalde de la población, Don Virgilio Ramos, había sido gratificado en la cantidad de $100 por Don Abelardo de la Haba, para que no se opusiera a la reedificación de una casa sita en el pueblo de Manatí y propiedad de la Sucesión Brunet.

"*Resultando:* que el tribunal sentenciador calificó los hechos probados de delito comprendido en el artículo 265 del Código Penal, y de autor del mismo a Antonio Pomales Gómez, sin circunstancias modificativas de su responsabilidad, por lo que le condenó a la pena de dos meses y un día de arresto mayor, accesorias y costas.

"*Resultando:* que contra esta sentencia ha interpuesto la representación del procesado recurso de casación por infracción de ley, autorizado (*) por el No. 1 del artículo 849 de la Ley de Enjuiciamiento Criminal, citando como infringido el artículo 265 del Código Penal, por aplicación indebida, pues en el resultando transcrito no se expresa que Don Virgilio Ramos recibiera como alcalde en el ejercicio de sus funciones la dádiva que se indica, requisito indispensable para que como tal alcalde fuera calumniado y tampoco en el propio

concepto de alcalde ha sido injuriado, tanto por la razón antedicha, cuanto porque el hecho de ser gratificada una persona para que no ejecute actos lícitos que puede ejecutar, no cede en su deshonra, descrédito o menosprecio, máxime cuando se trata de quien, como el Sr. Ramos, tiene bien cimentada su reputación.

"*Resultando:* que el Ministerio Fiscal impugnó el recurso en el acto de la vista.

"*Visto*, siendo ponente el Juez Asociado Don José C. Hernández.

"*Considerando:* que cometen el delito que define y castiga el artículo 265 del Código Penal, los que hallándose una autoridad en el ejercicio de sus funciones, o con ocasión de éstas, la calumniaren, injuriaren o insultaren de hecho o de palabra, fuera de su presencia o en escrito que no estuviere a ella dirigido, siendo calumnia la falsa imputación de un delito de los que dan lugar a procedimiento de oficio, e injuria, toda expresión proferida o acción ejecutada en deshonra, descrédito o menosprecio de otra persona, según los artículos 471 y 475 del mismo código.

"*Considerando:* que la imputación hecha públicamente por el recurrente al alcalde de Manatí, Don Virgilio Ramos, fuera de su presencia, de haber sido gratificado con la cantidad de $100 a los fines que se expresan, constituye indudablemente un delito de cohecho bajo alguna de las formas que se definen en el Capítulo 9 del Título 7 del Libro 2 del Código Penal, y si no lo constituyera sería injuriosa a la autoridad del alcalde de Manatí, Don Virgilio Ramos, como ofensiva a la rectitud e imparcialidad que deben revelarse en el ejercicio de las funciones de su cargo; siendo evidente, por tanto, que la sala sentenciadora no ha incurrido en el error de derecho en que se funda el recurso, ni cometido la infracción legal que se le atribuye.

"*Fallamos:* que debemos declarar y declaramos no haber lugar al recurso de casación interpuesto por Antonio Pomales Gómez al que condenamos en las costas; y con devolución de la causa, comuníquese esta resolución al Tribunal de Distrito de Arecibo, a los efectos consiguientes. (\*)

"Así por ésta nuestra sentencia, que se publicará en la Gaceta Oficial, lo pronunciamos, mandamos y firmamos: José S. Quiñones, José C. Hernández, José Ma. Figueras, Louis Sulzbacher, J. H. Mac-Leary.

"*Publicación*. Leída y publicada fué la anterior sentencia por el Señor Juez Asociado del Tribunal Supremo Don José C. Hernández,

celebrando audiencia pública dicho tribunal en el día de hoy, de que certifico como secretario, en Puerto Rico a 3 de junio de 1902. Antonio F. Castro."

Esta sentencia fué votada y firmada, como se ve, por el señor juez disidente. En esa sentencia se aplicó el mismo artículo 265 del Código Penal o sea el que se fué en alma y espíritu, según él, con la soberanía de España.

¿Y es posible que ese cadáver estuviese vivo en la ley y en la mente y conciencia del honorable señor juez disidente, en ese caso a que se refiere la sentencia copiada, y en cuya fecha ya había cesado la soberanía española y que hoy esté ese artículo verdaderamente muerto para no aplicarlo a Hobart S. Bird bajo el argumento del cambio de soberanía? Salta a la vista la inconsecuencia que puede tener justificación en el olvido involuntario de esos casos en que intervino antes, con su voto y su firma, el señor juez disidente.

Todos los demás puntos del voto están tratados en el dictamen del señor ponente que los suscribientes aceptamos, e hicimos propio, al dictar la resolución negando el mandamiento de *habeas corpus* solicitado por Hobart S. Bird.

Concluimos manifestando de nuevo que sólo la necesidad de justificar nuestra consecuencia y conducta al emitir nuestro voto y dictar la resolución, nos obliga a salir por este medio al encuentro del voto del honorable juez disidente, pues las razones en él expuestas, no las expresó en su oportunidad, es decir, al discutir el caso, y entonces todas se hubieran rebatido, como lo hacemos ahora, al conocer las razones en que funda su disentimiento con la sentencia.(*)